FILED
2026 Nov-05 PM 01:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**JASPER DIVISION**

| | | |
|---|---|---|
| **DEVIN DARNELL THOMPSON,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 6:20-cv-1612-AMM** |
| | ) | |
| **TERRY RAYBON, Warden of William C. Holman Correctional Facility,** | ) | |
| | ) | |
| **Respondent.** | ) | |

# MEMORANDUM OPINION

Devin Darnell Thompson, a convicted Alabama prisoner also sometimes known as Devin Darnell Moore, petitions the court for a writ of habeas corpus under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Doc. 15. Mr. Thompson challenges the constitutionality of his capital convictions and death sentence in the Circuit Court of Fayette County, Alabama. *See id.* at 1–2.

Alabama courts rejected as meritless many of the constitutional claims in Mr. Thompson's petition. Accordingly, this court cannot grant habeas relief on those claims unless Mr. Thompson proves that an egregious legal or factual error was integral to the state court reasoning. Mr. Thompson has not satisfied that standard. Mr. Thompson cannot obtain habeas relief based on his remaining claims for

procedural reasons. The court **DENIES** Mr. Thompson's petition, including his requests to permit discovery and hold an evidentiary hearing.

## I. BACKGROUND

Mr. Thompson was indicted, convicted, and sentenced to death for the 2003 murders of three Fayette Police Department employees: Officers James Eddie Crump and Arnold Gunther Strickland, and Dispatcher Leslie Franklin "Ace" Mealer. Doc. 15 at 5. Relevant history is set forth below.

### A. The Murders

The Alabama Court of Criminal Appeals summarized the guilt phase evidence in this case as described below. *Thompson v. State* ("*Thompson ACCA Direct*"), 153 So. 3d 84, 101–02 (Ala. Crim. App. 2012), *as modified on denial of reh'g.*, 153 So. 3d 84 (Ala. Crim. App. 2012).

Officers Crump and Strickland "approached a vehicle parked in the lot of a local restaurant" in the early morning on the day of the triple homicide. *Id.* at 101. They discovered Mr. Thompson "asleep" in that car, contacted a dispatcher, and learned "the vehicle had been stolen." *Id.* Officers Crump and Strickland "took [Mr.] Thompson into custody" and transported him to the municipal police station. *Id.*

While booking Mr. Thompson, the officers received information about a burglary of a dry cleaners near the location "where the car had been stolen." *Id.* at

102. The burglar reportedly stole clothing from the business and potentially left an incriminating shoe print. *Id.* The officers removed Mr. Thompson's handcuffs for fingerprinting and one of his shoes for printing tied to the burglary. *Id.*

While Mr. Thompson was being fingerprinted, he "took [Officer] Strickland's .40–caliber service pistol and shot [him] in the head." *Id.* After "cross[ing] the hall," Mr. Thompson "shot Officer Crump in the head." *Id.* "[W]alk[ing] toward the exit," Mr. Thompson encountered Dispatcher Mealer and shot him "multiple times." *Id.*

Mr. Thompson "left the station" but tried "to reenter . . . when he realized that one of his shoes was still inside." *Id.* Mr. Thompson could not open that door because it "had automatically locked." *Id.* Mr. Thompson walked "to the Fayette Fire Station" which was "in the same building" as the police department. *Id.* There, he "told two firemen that 'something bad had happened up front.'" *Id.* Mr. Thompson "fled the scene" in a stolen police cruiser. *Id.*

"Tim Brown, a paramedic with the Fayette Medical Center, was dispatched to the Fayette Police Department." *Id.* at 101. He saw Dispatcher "Mealer's body lying on the other side of the [locked] door to the police station." *Id.* After forcing his way inside, Mr. Brown discovered that Dispatcher "Mealer had been shot in the head." *Id.* Mr. Brown walked further into the station and found Officers Crump and Strickland, "shot in the head and . . . lying in a pool of blood." *Id.*

On the same day, law enforcement arrested Mr. Thompson near Columbus, Mississippi. *Id.* at 102. The pistol Mr. Thompson took from Officer Strickland was found in the stolen police cruiser. *Id.*

**B. Pretrial Procedure**

A Fayette County Grand Jury indicted Mr. Thompson on six charges of capital murder. Doc. 14-1 at 50–52. Two capital counts were for the murders of Officers Crump and Strickland; one was for the murders of two or more persons; and three were for robbery-murder based on the stolen pistol. *Id.* Intentional murder is capital under Alabama law when the defendant kills the victim "during a robbery in the first degree or an attempt thereof." Ala. Code § 13A–5–40(a)(2). Intentional murder is also capital when the defendant kills a police officer "while . . . on duty," *id.* § 13A–5–40(a)(5), or when the defendant kills "two or more persons . . . by one act or pursuant to one scheme or course of conduct," *id.* § 13A–5–40(a)(10).

The trial court appointed attorneys James O. Standridge and Shelly D. Hood to defend Mr. Thompson, and these attorneys continued to represent him through trial. Doc. 14-1 at 49; Doc. 14-4 at 124. Mr. Thompson sought but did not receive youthful offender treatment. Doc. 14-1 at 64, 66. At his September 2003 arraignment, Mr. Thompson pleaded not guilty or not guilty due to a mental disease or defect. *Id.* at 65.

Mr. Thompson moved to change the trial venue from Fayette County, which relief the State did not oppose. *Id.* at 136–37, 146–47. The court transferred venue to the Circuit Court of Lauderdale County. *Id.* at 153. After obtaining additional information, the court transferred the trial location to Lamar County and set a hearing. Doc. 14-2 at 45–46. In that hearing, Mr. Thompson withdrew his motion to change venue, and the court returned the trial location to the Fayette County Circuit Court. *Id.* at 47–48.

**C. Trial Procedure**

Trial commenced on July 18, 2005. Doc. 14-4 at 123. Mr. Thompson was tried on all six counts of capital murder. Doc. 14-5 at 48.

In the guilt phase, Mr. Thompson "did not dispute that he shot and killed the [victims]." *Thompson ACCA Direct*, 153 So. 3d at 102. His defense was that he was not liable due to mental disease or defect. *Id.* Mr. Thompson "presented expert testimony . . . that he was suffering from post-traumatic stress disorder ("PTSD")" when he committed the murders. *Id.* According to Mr. Thompson, because he was in a PTSD-induced "dissociative state" "at the time of the murders," "he was not responsible for his actions." *Id.* To counter this defense, the State relied on expert evidence that Mr. Thompson "was not in a dissociative state when he committed the murders." *Id.*

The jury convicted Mr. Thompson of all the capital charges. *Id.*; Doc. 14-2 at 148–53.

In the penalty phase, to support its case for death the State relied on the jury's guilt-phase robbery and two-or-more-persons convictions as aggravating circumstances under Alabama Code §§ 13A–5–49(4) and 13A–5–49(9). Doc. 14-2 at 180–82; Doc. 14-22 at 138–39. The State sought to prove "at least two other[]" aggravating circumstances. Doc. 14-22 at 139. One factor was that Mr. Thompson murdered the victims "for the purpose of avoiding or preventing [his] lawful arrest or effecting an escape from custody" under Alabama Code § 13A–5–49(5). Doc. 14-22 at 139. The second was that Mr. Thompson committed murder "to disrupt or to hinder the lawful exercise of any governmental function or the enforcement of laws" under Alabama Code § 13A–5–49(7). Doc. 14-22 at 140. The State called five witnesses to testify—Dispatcher Mealer's stepmother, June Mealer; Officer Crump's father, Willie Crump; Dispatcher Mealer's friend, Barry Corkren; Officer Crump's ex-wife, Martha Crump; and Officer Strickland's son, Blake Strickland. Doc. 14-4 at 128; Doc. 14-22 at 159, 165, 178, 182, 191–92.

Mr. Thompson's mitigation case included testimony from his mother's boyfriend, Jerry Reed; his uncle, Hester Whitiker; his older sister, Kelly Moore; his Walker High School football coach, teacher, and assistant principal, Roger Satcher;

the son of his father's girlfriend, Brandon Smith; a licensed psychologist, Marianne Rosenzweig; and his foster parent, Maxine Austin. Doc. 14-4 at 128; Doc. 14-22 at 201; Doc. 14-23 at 25, 39, 57, 74, 102, 173–74.

The jury returned an advisory verdict of capital punishment, and ten of the twelve jurors voted in a favor of the death penalty. *Thompson ACCA Direct*, 151 So. 3d at 102; Doc. 14-2 at 154.

**D. Sentencing**

On October 6, 2005, the trial court conducted a sentencing hearing. Doc. 14-24 at 95, 99. The Alabama Board of Pardons and Parole prepared a pre-sentence investigative report that the court "furnished to the parties." *Id.* at 100; Doc. 14-2 at 158–69. Additionally, the parties received records from a "confidential" mental evaluation of Mr. Thompson that Taylor Hardin Medical Facility conducted in 2004.[1] Doc. 14-24 at 100–01; Doc. 14-2 at 169. The court overruled Mr. Thompson's objections to both documents. Doc. 14-24 at 101–02. Neither Mr. Thompson nor the State offered additional penalty-phase evidence.

[1] The court has been unable to locate this confidential mental health report in the uploaded state court record. On habeas review, neither party argues that the document is essential to deciding Mr. Thompson's claims.

Ultimately, the trial court "followed the jury's recommendation and sentenced [Mr.] Thompson to death." *Thompson ACCA Direct*, 153 So. 3d at 101; Doc. 14-2 at 190. As the court found in a written sentencing order, four aggravating circumstances existed beyond a reasonable doubt: Mr. Thompson committed murder "while [he] was engaged in or was in the commission of, or flight after committing robbery" in the first degree; "for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;" and "to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws." Doc. 14-2 at 180–81 (emphasis omitted). Additionally, the court found that Mr. Thompson "intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct." *Id.* at 181 (emphasis omitted).

The jury's guilt-phase convictions established the first and fourth aggravating circumstances. *Id.* at 180–82. As support for the second circumstance, the court found that Mr. Thompson "was undergoing the booking process at the police station . . . when he took Officer Strickland's gun, killed the three men, and escaped in a police cruiser." *Id.* at 181. As support for the third circumstance, the court determined that Mr. Thompson murdered the victims to avoid giving a shoe print as a burglary suspect and disrupt the investigation of his criminal role in "the stolen car[] and other alleged break-ins and burglaries in Jasper." *Id.* The trial court found

that these aggravators "in the aggregate" were "extremely weighty"—the triple murder of public safety servants "for the purpose[s] of escaping from custody and hindering the enforcement of laws." *Id.* at 182.

The trial court then turned to the evidence of mitigating circumstances. *See id.* The court identified Mr. Thompson's "troubled childhood and diagnosis of Post Traumatic Stress Disorder (PTSD)" as "the primary focus" of his penalty-phase case. *Id.* The court described "[t]hese issues" as "closely related" because Mr. Thompson alleged that his "abusive childhood resulted in PTSD." *Id.*

The court described Mr. Thompson's childhood. Until age five, Mr. Thompson's mother, Gloria Thompson, raised him. *Id.* at 183. Ms. Thompson's life was "chaotic," she abused alcohol and drugs, she "had numerous sexual partners," and she lost custody of him. *Id.* After being removed from his mother's care, Mr. Thompson "lived in many different places with relatives and in foster homes" for several years. *Id.*

At age seven, Mr. Thompson "went to live with his biological father," Kenneth W. Moore. *Id.* Mr. Moore owned a janitorial service and immediately required Mr. Thompson to work "up to forty hours per week" for that business. *Id.* Witnesses testified that Mr. Moore physically and verbally abused Mr. Thompson and abused other family members in Mr. Thompson's presence. *Id.* This included

making Mr. Thompson "do grueling physical exercise as punishment." *Id.* At age fifteen, Mr. Thompson "ran away from his father's home" and returned to living with his mother. *Id.*

The trial court acknowledged that Mr. Thompson's "environment was not kind to [him]" and played "a role in making [him] what he is." *Id.* The court credited Mr. Thompson's "abusive and troubled childhood" as "a non-statutory mitigating circumstance." *Id.* at 185.

The court found also that "these environmental factors . . . appear[ed] weak" when weighed against the aggravating circumstances and "the necessity for every person being morally responsible for his or her own actions." *Id.* at 183. The court discredited the argument that a troubled childhood "should in some way mitigate the punishment for these bad people," as a position leading "to the absurd conclusion that only" capital defendants "who come from an impeccable social background deserve the death penalty." *Id.* at 183–84.

The trial court acknowledged that expert evidence from both sides supported Mr. Thompson's PTSD diagnosis. *Id.* at 184. The experts disputed whether Mr. Thompson was in a PTSD-induced dissociative state when he killed the victims. *Id.* The court agreed with the jury's rejection of this dissociation defense to capital murder and found that Mr. Thompson's PTSD "did not rise to the level of . . . mental

disease or defect." *Id.* But for penalty-phase purposes, the court determined that the condition could produce "emotional distress" and "substantially impair[]" Mr. Thompson's ability "to conform his conduct to the requirements of law." *Id.* at 185. The court treated Mr. Thompson's PTSD as a "factual and real" mitigator to weigh against the aggravating circumstances. *Id.*

The trial court found that four of the seven categories of statutory mitigation existed, but assigned minimal weight to each. *See* Ala. Code § 13A–5–51; Doc. 14-2 at 185–88. The court determined that Mr. Thompson's lack of a "significant history of prior criminal activity" was "extremely weak" mitigation. Doc. 14-2 at 185. The court found that his PTSD supported the extreme or emotional disturbance factor, but gave that circumstance "very little weight" "standing on its own." *Id.* at 185–86. The court described Mr. Thompson's age of eighteen years when he committed the murders as a "weak" mitigating circumstance. *Id.* at 188.

The court found that Mr. Thompson "knew . . . what he was doing was wrong and criminal. . . . [and] chose to do it anyway." *Id.* at 186. The trial court determined that Mr. Thompson had "engaged in purposeful activit[ies]" and reacted to unfolding events, which conflicted with his argument that "he was in a 'bad dream'" due to PTSD. *Id.* at 187. Examples of purposeful activities and reaction included Mr. Thompson's removing "a fingerprint card with identifying information from the

police station[;] taking car keys from the body of one of the police officers[;] [stealing] a police cruiser[;] attempting to re-enter the police station to retrieve his shoe[;] [modifying] his route of escape after hearing reports on the police radio[;] changing clothes[;] [and] hiding the police cruiser and removing the emergency light bar." *Id.* The trial court further found that Mr. Thompson's statements about the murders demonstrated that he "clearly remembered events and details" and "adjust[ed] his behavior to the events." *Id.* at 187–88.

Overall, the court discounted the dissociative-state theory as "not supported by the evidence and . . . far[-]fetched, to say the least." *Id.* at 188. Ultimately, the court determined that this factor "d[id] little to mitigate the aggravating circumstances." *Id.*

The court considered additional areas of non-statutory mitigation. *Id.* at 188–90. The trial court credited one of the seven that defense counsel argued—Mr. Thompson "would benefit from treatment and/or counseling," coupled with a lack of evidence that he posed a risk of future dangerousness. *Id.* at 189. The court gave this circumstance "very little weight." *Id.*

The court concluded that "the aggravating circumstances . . . carr[ied] great weight in the mind of any reasonable and rational person" and "far outweigh[ed] the mitigating circumstances shown by the evidence." *Id.* at 190.

### E. Subsequent Proceedings

Mr. Thompson's case then traveled to the Alabama appellate courts twice—once on direct review and once on collateral appeal from the dismissal of his postconviction petition.

#### 1. The Direct Appeal

Bryan A. Stevenson, Angela L. Setzer, and Charlotte R. Morrison of the Equal Justice Initiative represented Mr. Thompson in his direct appeal. Doc. 14-66 at 2; Doc. 14-70 at 2. The Alabama Court of Criminal Appeals affirmed the judgment. *Thompson ACCA Direct*, 153 So. 3d at 191. Both the Alabama Supreme Court and Supreme Court of the United States denied certiorari review. *Thompson v. State* ("*Thompson ASC Direct*"), 153 So. 3d 191, 191 (Ala. 2014); Doc. 14-70 at 119; *Thompson v. Alabama*, 574 U.S. 894 (2014).

#### 2. The Rule 32 Petition

Mr. Thompson then petitioned the Circuit Court of Fayette County for collateral relief under Alabama Rule of Criminal Procedure 32. Doc. 14-71 at 6. Mr. Thompson amended his Rule 32 petition once, *id.* at 140–201; Doc. 14-72 at 2–120; Doc. 14-73 at 1–81, and the trial court dismissed the petition without an evidentiary hearing, Doc. 14-74 at 200–01. The Alabama Court of Criminal Appeals affirmed, *Thompson v. State* ("*Thompson Collateral*"), 310 So. 3d 850, 885 (Ala. Crim. App.

2018), and denied rehearing, *id.* at 885–87. The Alabama Supreme Court denied certiorari review. Doc. 14-78 at 190.

**3. The Habeas Petition**

Mr. Thompson then petitioned this court for habeas relief and has amended that pleading once. Docs. 1, 15. Appointed counsel, Mr. James C. Larew and Mr. James M. Hubbard of the Equal Justice Initiative, represent Mr. Thompson on habeas review. *See* Docs. 10, 43, 47.

In his amended Section 2254 petition, Mr. Thompson requested discovery and an evidentiary hearing. Doc. 15 at 148–49. Warden Terry Raybon filed an answer and brief. Docs. 24, 26. Mr. Thompson replied. Doc. 33-1.

## II. LEGAL STANDARDS

Under Section 2254(a), a federal district court is prohibited from entertaining a petition for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court" unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims of "an alleged defect in a [state] collateral proceeding" or claims related to a "state's interpretation of its own laws or rules" are not a basis for federal habeas relief under Section 2254. *Alston v. Dep't of Corr.*, 610 F.3d 1318, 1325–26 (11th Cir. 2010) (cleaned up).

**A. Exhaustion of State Court Remedies**

A habeas petitioner must present his federal claims to the state court and exhaust all the procedures available before seeking relief in federal court. 28 U.S.C. § 2254(b)(1)(A); *Medellin v. Dretke*, 544 U.S. 660, 666 (2005). "'State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358–59 (11th Cir. 2003) (cleaned up) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

"[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). "The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1345 (11th Cir. 2004) (cleaned up). "[A]n issue is exhausted if the reasonable reader would understand the claim's particular legal basis and specific factual foundation to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*,

680 F.3d 1271, 1286 (11th Cir. 2012) (cleaned up).

**B. The Procedural Default Doctrine**

The procedural default doctrine sometime requires district courts to dismiss a habeas petition without reaching its substance. If a petitioner fails to raise his federal claim in state court at the time and in the manner dictated by state procedural rules, the state court may decide the claim is not entitled to a review on the merits. *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). "[A] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim," so long as "the state procedural ruling rests upon adequate and independent state grounds." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (cleaned up).

A procedural default may also occur when a federal petitioner's claim is unexhausted. Although a district court may dismiss the claim without prejudice or stay the cause of action to allow the petitioner to avail himself of his state remedies, *see Rose v. Lundy*, 455 U.S. 509, 519–20 (1982), "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect," *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999).

**C. Overcoming Procedural Default – Cause & Prejudice**

The "cause and prejudice" exception excuses procedural default when a petitioner can prove both "cause for the default and prejudice attributable thereto." *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (cleaned up). To establish cause, a petitioner must prove "that some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A non-exhaustive list of factors that may constitute cause includes "a showing that the factual or legal basis for a claim was not reasonably available to counsel," "some interference by officials . . . [that] made compliance impracticable," and constitutionally "ineffective assistance of counsel." *Id.*

To establish prejudice, a habeas petitioner must demonstrate "not merely that the errors . . . created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis omitted). In the context of a defaulted claim of ineffective assistance of trial counsel, a petitioner must show not only "cause," but also "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez v. Ryan*, 566 U.S. 1, 14 (2012).

**D. AEDPA**

"AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011) (cleaned up). To grant habeas relief, a district court must find not only that the constitutional claims are meritorious, but also that the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010).

**E. Burden of Proof & Heightened Pleading Standards for Habeas Review**

The petitioner bears the burden to establish entitlement to relief under Section 2254(d)(1) or (d)(2). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). "[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

A state court's decision is contrary to "clearly established precedents [of the

United States Supreme Court] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005).

To determine whether a state court's decision is an "unreasonable application" of clearly established federal law, "[t]he pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "For purposes of [Section] 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Id.* (emphasis omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). "A state court must be granted a deference and latitude that are not in operation when the case involves review under [the relevant constitutional] standard itself." *Id.* "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (cleaned up).

Whether a state court's application of federal law was unreasonable involves "a substantially higher threshold" than a correctness threshold. *Schriro v. Landrigan*,

550 U.S. 465, 473 (2007). "Ultimately, before a federal court may grant habeas relief . . . , 'a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Guzman*, 663 F.3d at 1346 (quoting *Harrington*, 562 U.S. at 103). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102.

"[W]hether a state court errs in determining the facts is a different question from whether it errs in applying the law." *Rice v. Collins*, 546 U.S. 333, 342 (2006). Section 2254(d)(2) limits the availability of federal habeas relief due to factual error; a petitioner must establish a state court relied on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" to deny the claim.

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (quoting *Rice*, 546 U.S. at 341–42). But, "when a state court's adjudication of a habeas claim results in a decision that is based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding, [a federal] [c]ourt is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Adkins v. Warden, Holman Corr. Facility*, 710 F.3d 1241, 1249 (11th Cir. 2013) (cleaned up).

A state court's factual determinations are presumptively correct under Section 2254(e)(1), and "the petitioner must rebut 'the presumption of correctness by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (cleaned up) (quoting 28 U.S.C. § 2254(e)(1)). "Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Id.* at 1177 (cleaned up).

**F. Claims of Ineffective Assistance of Counsel**

"[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134 (1982). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696.

"*Strickland* . . . provides the standard for inadequate assistance of counsel under the Sixth Amendment." *Premo v. Moore*, 562 U.S. 115, 118 (2011). *Strickland* states:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. . . .
>
> Second, the defendant must show that the deficient performance prejudiced the defense. . . . Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687. "Surmounting *Stickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

As for the first part of *Strickland*, "the proper standard for attorney performance is that of reasonably effective assistance," and "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. The court should consider "all the circumstances," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 688–89. This part is satisfied only when "the identified acts or omissions were outside the wide range of

professionally competent assistance." *Id.* at 690. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

As for the second part of *Strickland*, "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Id.* at 693. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The appropriate inquiry is as follows:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Id.* at 695. In making this evaluation, the court "must consider the totality of the evidence before the judge or jury." *Id.*

"Establishing that a state court's application of *Strickland* was unreasonable under [Section] 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. The interplay between *Strickland* and Section 2254(d) results in "double deference" on federal habeas review, which "is doubly difficult for a petitioner to overcome." *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011). "The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Harrington*, 562 U.S. at 105. "When [Section] 2254(d) applies, the question is not whether counsel's actions were reasonable. . . . [but] whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

## III. ANALYSIS OF MR. THOMPSON'S CLAIMS

### A. Unbriefed Claims

In his reply brief, Mr. Thompson states that he has not briefed several issues in his petition, due to this court's page limitations and the excess pages required for the claims he has addressed. *See* Doc. 33-1 at 157; Docs. 33–34. On those issues, Mr. Thompson rests on the arguments in his petition. *See* Doc. 33-1 at 157.

Mr. Thompson's decision not to brief these issues leaves him with no response to many arguments in Warden Raybon's opposition. It is not the responsibility of the court to fashion a response on Mr. Thompson's behalf. *See King v. Warden, Ga. Diagnostic Prison*, 69 F.4th 856, 877 (11th Cir. 2023). When the court weighs the

arguments of Warden Raybon on these issues against the allegations in Mr. Thompson's petition, Mr. Thompson has not overcome AEDPA deference or other defenses, as follows:

- Section III.A(i), ¶ 30—Warden Raybon contends that Mr. Thompson's youthful offender *Strickland* claim, Doc. 15 at 13–14, cannot support relief because the Alabama Court of Criminal Appeals' rejection of the prejudice prong was neither factually nor legally unreasonable, *see* Doc. 26 at 26;
- Section III.A.(i), part of ¶ 39—Warden Raybon maintains that Mr. Thompson's photographic evidence and bullet trajectory *Strickland* claims, Doc. 15 at 29–30, cannot support relief because the Alabama Court of Criminal Appeals' rejection of deficient performance was neither factually nor legally unreasonable, Doc. 26 at 34–35;
- Section III.H(ii)—Warden Raybon argues that Mr. Thompon's challenge of the trial court's failure to remove certain venire members who supported the death penalty, Doc. 15 at 75–76, cannot support relief because the Alabama Court of Criminal Appeals neither unreasonably found that potential jurors W.C. and D.H. could not apply the death penalty fairly nor unreasonably denied the claim, *see* Doc. 26 at 62–63. Notably, these potential jurors did not actually serve on the jury, *id.*;

- Section III.H(iii)—Warden Raybon contends that Mr. Thompson's jury sequester claim, Doc. 15 at 77–78, is not cognizable under Section 2254 because the Alabama Court of Criminal Appeals rejected it under Alabama law, and Mr. Thompson did not exhaust a federalized version of it, Doc. 26 at 63;
- Section III.H(v)—Warden Raybon maintains that Mr. Thompson's claim based on the admission of scanned copies as exhibits, Doc. 15 at 80–81, cannot support relief because the Alabama Court of Criminal Appeals' decision was neither factually nor legally unreasonable, Doc. 26 at 65–66;
- Section III.H(vi)—Warden Raybon argues that Mr. Thompson's discovery claim tied to law enforcement witnesses, Doc. 15 at 81–82, cannot support relief because the Alabama Court of Criminal Appeals' decision was neither factually nor legally unreasonable, Doc. 26 at 66;
- Section III.H(vii)—Warden Raybon contends that Mr. Thompon's claim based on the admission of bullet trajectory testimony, Doc. 15 at 82–83, cannot support relief because the Alabama Court of Criminal Appeals' decision was neither factually nor legally unreasonable, Doc. 26 at 67;
- Section III.H(ix)—Warden Raybon maintains that Mr. Thompson's demonstrative-aids challenge, Doc. 15 at 85–87, is not cognizable under

Section 2254 because the Alabama Court of Criminal Appeals rejected it under Alabama law, Doc. 26 at 69–70. Alternatively, Warden Raybon argues that the claim cannot support relief because the state court decision was neither factually nor legally unreasonable, *id.* at 70;

- Section III.H(x)—Warden Raybon contends that Mr. Thompson's challenge based on the admission of certain bad-acts evidence, Doc. 15 at 88–91, is not cognizable under Section 2254 because the Alabama Court of Criminal Appeals rejected it under Alabama law, Doc. 26 at 70–71. Alternatively, Warden Raybon maintains that the claim cannot support relief because the state court decision was neither factually nor legally unreasonable, *id.* at 71;
- Section III.I—Warden Raybon argues that Mr. Thompson's victim-impact-evidence claim, Doc. 15 at 98–102, cannot support relief because the Alabama Court of Criminal Appeals' decision was neither factually nor legally unreasonable, Doc. 26 at 73–74;
- Section III.K—Warden Raybon contends that Mr. Thompson's claim that the trial court erred in removing impartial jurors, Doc. 15 at 106–07, cannot support relief because the Alabama Court of Criminal Appeals' decision was neither factually nor legally unreasonable, Doc. 26 at 76–77;

- Section III.O—Warden Raybon maintains that Mr. Thompson's claims based on certain penalty-phase jury instructions, Doc. 15 at 119–22, cannot support relief due to lack of exhaustion, insufficient pleading, and lack of *de novo* merit on one of the instructions and because the Alabama Court of Criminal Appeals' rulings on the remaining instructions were neither factually nor legally unreasonable, Doc. 26 at 87–94;
- Section III.R—Warden Raybon argues that Mr. Thompson's mistrial claim, Doc. 15 at 135–37, cannot support relief because the Alabama Court of Criminal Appeals' decision was neither factually nor legally unreasonable, Doc. 26 at 107–09;
- Section III.T—Warden Raybon contends that Mr. Thompson's method of execution claim, Doc. 15 at 139–40, cannot support relief because the Alabama Court of Criminal Appeals' decision was neither factually nor legally unreasonable, *see* Doc. 26 at 111. Warden Raybon also maintains that this claim is not cognizable under Section 2254, *id.*;
- Section III.U—Warden Raybon argues that Mr. Thompson's claim based on an unreliable presentence report, Doc. 15 at 140–42, cannot support relief because the Alabama Court of Criminal Appeals' decision was neither factually nor legally unreasonable, Doc. 26 at 112–13; and

- Section III.V—Warden Raybon contends that Mr. Thompson's cumulative error claim, Doc. 15 at 142, cannot support relief because the Alabama Court of Criminal Appeals' decision was neither factually nor legally unreasonable, Doc. 26 at 113–14.

**B. Briefed Claims**

**1. *Strickland* Voir Dire Claim**

Mr. Thompson asserts that trial counsel provided ineffective assistance in voir dire by failing to ask prospective jurors about their knowledge of a local memorial service for the slain victims and a *60 Minutes* segment about this case. Doc. 15 at 15–17. Mr. Thompson adds in reply that counsel assisted ineffectively by failing to ask whether venire members were aware of Mr. Thompson's father's claim that he had taken "Mr. Thompson to church to try to have the devil leave him." Doc. 33-1 at 57. Mr. Thompson raised this issue in his Rule 32 petition and on collateral appeal. Doc. 14-71 at 151–53 ¶¶ 37–41; Doc. 14-76 at 2, 52–55. The circuit court summarily dismissed this claim for timing and pleading deficiencies under Alabama Rules of Criminal Procedure 32.2(a)(3), 32.2(a)(5), 32.6(b), and 32.7(d). Doc. 14-74 at 201. The court did not address this or any claim individually under these Rule 32 subparts; it dismissed all claims in Mr. Thompson's petition based on this collection of rules. *See id.* at 200–01.

The Alabama Court of Criminal Appeals determined that Mr. Thompson's allegations were inadequate to establish deficient performance or prejudice under *Strickland*. *See Thompson Collateral*, 310 So. 3d at 866–68. The court pointed out that "trial counsel's actions during voir dire are matters of trial strategy," *id.* at 867, implicitly deciding that counsel could have reasonably chosen to avoid asking the venire about these areas for strategic reasons. The court determined also that voir dire was "extensive" and sufficient to test juror bias, including exposure to pretrial publicity. *Id.* at 867–88. And the court concluded that Mr. Thompson's prejudice allegations were insufficient because he had not named any juror with knowledge of the omitted voir dire subjects. *Id.* at 867.

Under *Borden v. Allen*, 646 F.3d 785, 808 (11th Cir. 2011), this court must apply AEDPA deference to the Alabama Court of Criminal Appeals' analysis. In *Borden*, the Eleventh Circuit held that under AEDPA, a Rule 32 dismissal of a collateral claim for insufficient pleading is a merits-based ruling. *Id.* at 812. Accordingly, this court cannot grant habeas relief unless Mr. Thompson overcomes AEDPA deference under Section 2254(d)(1) or (d)(2).

Mr. Thompson relies only on Section 2254(d)(2). He maintains that the Alabama Court of Criminal Appeals "unreasonably determined the facts in light of the evidence in finding that [he] failed to prove that any juror attended the memorial

service with the prosecutor or watched the 60 Minutes episode." Doc. 33-1 at 55. To satisfy his burden, he cites the eulogy District Attorney Chris McCool gave at the victims' memorial service, parts of that eulogy that District Attorney McCool used at trial, and the "graphic" discussion of the case on *60 Minutes*. *Id.* at 56–57. Additionally, Mr. Thompon references his father's devil remark and "horrific abuse" of him. *Id.* at 57.

None of this evidence establishes that the Alabama Court of Criminal Appeals' factual findings underlying its rejection of this *Strickland* claim were unreasonable. Indeed, this evidence is unrelated and nonresponsive to those findings. Further, the evidence does not undercut the implicit finding that counsel's choices about what not to ask the venire were strategic and reasonable. *See Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1223 (11th Cir. 2013) (concluding that a state court's implicit findings may support the application of AEDPA deference). Mr. Thompson has not satisfied his burden, and AEDPA deference bars habeas relief.

**2. *Strickland* Pediatric Expert Claims**

Mr. Thompson asserts that trial counsel provided ineffective assistance in both the guilt and penalty phases of trial by failing to retain "a pediatric psychologist specializing in the effect of trauma on children." Doc. 15 at 17, 33, 37; Doc. 33-1 at 45. The pediatric expert Mr. Thompson identifies is "Dr. Resmiye Oral, a faculty

member of the University of Iowa College of Medicine" who interviewed him in person at Holman Correctional Facility. Doc. 15 at 17. Mr. Thompson raised these issues in his Rule 32 petition and on collateral appeal. Doc. 14-71 at 153–59 ¶¶ 44–58; Doc. 14-72 at 28–29 ¶ 257; Doc. 14-76 at 2, 66–71, 89–90. The circuit court summarily dismissed these claims. *See* Doc. 14-74 at 201.

The Alabama Court of Criminal Appeals denied the guilt-phase claim for several reasons. The court determined that without pleading that "Dr. Oral was available and that she could have testified as an expert witness in Alabama in 2005," Mr. Thompson's allegations were inadequate. *Thompson Collateral*, 310 So. 3d at 870 (citing Ala. R. Crim. P. 32.6(b)). The Alabama Court of Criminal Appeals also ruled that a postconviction petitioner "does not show ineffective assistance merely [by] . . . present[ing] a new expert opinion." *Id.* (cleaned up). Additionally, the Alabama Court of Criminal Appeals concluded that the testimony of one of the clinical psychiatrists counsel retained as an expert, Dr. Rosenzweig, was largely cumulative of the testimony that Mr. Thompson asserted should have been presented by Dr. Oral. *Id.* And the court determined that Mr. Thompson "failed to specifically plead what testimony a pediatrician who specialized in child abuse . . . could have presented at the penalty phase." *Id.* at 878.

Mr. Thompson argues that the Alabama Court of Criminal Appeals unreasonably applied *Strickland* and *Porter v. McCollum*, 558 U.S. 30 (2009). Doc. 33-1 at 41. To establish that the court applied *Strickland* unreasonably, Mr. Thompson must identify relevant Supreme Court holdings that support a favorable resolution of his claim. Without precedents involving factual similarities, Mr. Thompson cannot demonstrate objective unreasonableness. *See Harrington*, 562 U.S. at 103.

Neither *Strickland* nor *Porter* satisfies Mr. Thompson's burden. *Strickland* and *Porter* involved claims of penalty-phase ineffective assistance, so neither authority supports Mr. Thompson's claims of guilt-phase ineffectiveness on this issue. *Strickland*, 466 U.S. at 698–99; *Porter*, 558 U.S. at 31.

In *Strickland*, the Supreme Court considered various penalty-phase issues, including counsel's failure to request a psychiatric report. 466 U.S. at 675–76. But the Supreme Court determined that the record in *Strickland* did not establish deficient performance or prejudice. *Id.* at 698–99. Therefore, *Strickland*'s outcome does not establish objective unreasonableness in the Alabama Court of Criminal Appeals' denial of Mr. Thompson's claim about a pediatric trauma expert. *See id.* And *Porter* did not involve a claim about counsel's failure to retain an expert. *See*

*Porter*, 558 U.S. at 31. Accordingly, Mr. Thompson has not satisfied his burden under Section 2254(d)(1).

**3. *Strickland* Neurological Testing Expert Claims**

Mr. Thompson asserts that trial counsel was ineffective for failing to retain a neuroscientist or other expert "to conduct testing, such as a PET scan . . . as part of his trial defense." Doc. 15 at 19. According to Mr. Thompson, "[i]f such testimony had been presented at the guilt and penalty phases of the trial, it would have assisted in the jury's assessment of [his] PTSD." *Id.* at 19–20.

Mr. Thompson failed to exhaust this argument as to the guilt phase of his trial. He raised this issue in the guilt-phase portion of his Rule 32 petition, and the circuit court summarily dismissed this claim. Doc. 14-71 at 159–61 ¶¶ 59–68; Doc. 14-74 at 201. And he mentioned this issue in a subheading in his brief on collateral appeal, but did present a substantive argument about it in that brief. *See* Doc. 14-76 at 2, 66–71. The Alabama Court of Criminal Appeals did not address it in its guilt-phase analysis, *see* Doc. 26 at 29, and Mr. Thompson did not raise this issue in his certiorari petition to the Alabama Supreme Court, Doc. 14-78 at 2–5, 55–61. Accordingly, Mr. Thompson did not exhaust this claim about the guilt phase of his trial. Mr. Thompson makes no attempt to excuse this default, and it forecloses his reliance on this allegation to obtain habeas relief.

Mr. Thompson exhausted this claim as to the penalty phase of his trial. He asserted the claim in his Rule 32 petition, which the circuit court dismissed. Doc. 14-72 at 30 ¶ 259 & n.11; Doc. 14-74 at 201. He raised the issue on collateral appeal, Doc. 14-76 at 2, 92–93, and the Alabama Criminal Court of Appeals affirmed the dismissal, on the ground that Mr. Thompson had "failed to plead what result the brain tests would have revealed" and thus "what testimony . . . a neurologist could have presented at the penalty phase." *Thompson Collateral*, 310 So. 3d at 877–78. That ruling is a merits decision entitled to AEDPA deference. *See Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1260 (11th Cir. 2016).

Mr. Thompson argues that the Alabama Court of Criminal Appeals "made an unreasonable determination of the facts in light of the evidence[] and . . . unreasonably applied *Strickland*." Doc. 33-1 at 74. The evidence he cites theorizes how a brain imaging expert could have helped him in the penalty phase. *Id.* But Mr. Thompson fails to identify any evidence that disproves the Alabama Court of Criminal Appeals' finding that his assertions were inadequate to establish prejudice. *See id.* Accordingly, Mr. Thompson fails to carry his burden under Section 2254(d)(2). As for Section 2254(d)(1), Mr. Thompson cites only *Strickland*, Doc. 33-1 at 74, and *Strickland* does not prove that the Alabama Court of Criminal Appeals unreasonably applied Supreme Court precedent to reject this argument.

**4. *Strickland* Expert Reports Claim**

Mr. Thompson asserts that trial counsel provided ineffective assistance by failing to have his "two trial experts prepare and submit written reports prior to trial." Doc. 15 at 20. Mr. Thompson raised this issue in the guilt-phase portion of his Rule 32 petition, and the circuit court dismissed it. Doc. 14-71 at 161–62 ¶¶ 69–72; Doc. 14-74 at 201. The experts Mr. Thompson identified were Drs. Rosenzweig and Nevels. Doc. 14-71 at 161 ¶ 70. Mr. Thompson presented the claim on collateral appeal, and the Alabama Court of Criminal Appeals affirmed. Doc. 14-76 at 2, 71–73; *Thompson Collateral*, 310 So. 3d at 871–72.

But in rejecting this claim, the Alabama Court of Criminal Appeals restated it as an assertion that "counsel was ineffective for failing to have State experts prepare written reports on their findings." 310 So. 3d at 871. Out of an abundance of caution, the court assumes arguendo that the Court of Criminal Appeals misunderstood or mischaracterized this claim and therefore did not decide it on the merits. Accordingly, this court reviews this claim *de novo*.

Mr. Thompson's allegations are inadequate to state a claim for habeas relief. He fails to allege facts to establish his counsel's deficient performance. No Alabama Rule of Criminal Procedure requires a defendant to have his own expert prepare a written report detailing expected opinions. *See Knotts v. State*, 686 So. 2d 431, 473–

74 (Ala. Crim. App. 1995); Doc. 26 at 30 n.3; Doc. 33-1 at 47 n.15. Alabama Rule of Criminal Procedure 16.2 allows the State to discover expert medical reports that "the defendant intends to introduce in evidence at the trial or which were prepared by a witness whom the defendant intends to call at the trial." Ala. R. Crim. P. 16.2(c). But "the rule does not state that an expert witness can be required to make a report at the request of an opposing party." *Knotts*, 686 So. 2d at 474. Accordingly, the rules leave room for counsel to make a strategic choice about whether to have an expert prepare a written report prior to trial. Mr. Thompson's allegations are insufficient to show that his counsel's strategic choice not to provide written pretrial expert reports to the State was unreasonable.

Even if Mr. Thompson could establish deficient performance, his allegations fail to establish prejudice. The crux of his claim is that counsel's failure to provide written pretrial reports delayed the State's challenge to video-game defense testimony and delayed resolution of that issue until after opening statements. Doc. 33-1 at 47–49. On Mr. Thompon's logic, his counsel told jurors that they would hear expert testimony on the video-game defense, and that evidence was later excluded mid-trial. But Mr. Thompson has not alleged that there was a reasonable probability of a different guilt-phase outcome if counsel had not mentioned the video-game defense in opening; this omission is particularly relevant in light of the PTSD,

childhood trauma, and dissociative-break evidence that Mr. Thompson did introduce.

This court joins other courts that have found a habeas petitioner failed to show prejudice from an isolated mention in opening of later-excluded evidence. *See Hathaway v. Dixon*, No. 1:21CV97/AW/ZCB, 2024 WL 957993, at *7 (N.D. Fla. Feb. 13, 2024) (finding that petitioner failed to show prejudice from counsel's opening statement advising that jury would hear an emergency call recording that the trial court later excluded as hearsay), *report and recommendation adopted*, 2024 WL 965616 (N.D. Fla. Mar. 6, 2024); *Hendrix v. Sec'y, Dep't of Corr.*, No. 4:21CV145-WS-HTC, 2023 WL 5206802, at *1, *6 (N.D. Fla. Mar. 2, 2023) (finding no prejudice from opening statement advising that the defendant would take the stand when he did not ultimately do so), *report and recommendation adopted*, 2023 WL 5207423 (N.D. Fla. Apr. 12, 2023).

In reply, Mr. Thompson raises a new argument about penalty-phase prejudice. He asserts that "but for this unprofessional error," a reasonable probability exists that he "would not have been sentenced to death, as only one more juror would have had to . . . vote[] against" that punishment. Doc. 33-1 at 48–49. Because the court does not consider arguments raised for the first time on reply, *see Park City Water Auth., Inc. v. N. Fork Apartments, L.P.*, No. 09-0240, 2009 WL 4898354, at *1 &

n.2 (S.D. Ala. Dec. 14, 2009), and in any event Mr. Thompson did not exhaust this assertion about penalty-phase prejudice, the court does not consider it on habeas review.

**5. *Strickland* Video-Game Defense Claims**

Mr. Thompson asserts that trial counsel provided ineffective assistance by failing to "properly . . . investigate and . . . present a coherent theory of defense . . . [in] the guilt and penalty phases." Doc. 15 at 21, 36–37.

Mr. Thompson asserts that "[p]erhaps most importantly," counsel "fail[ed] to bring the video game testimony into the mitigation phase" and made similar allegations about the penalty phase. Doc. 14-71 at 175 n.4; Doc. 14-72 at 28–29 ¶ 257; *see also* Doc. 14-71 at 167 ¶ 84 (referencing video game allegations "relevant" to the penalty phase). Mr. Thompson raised his video-game issues in his Rule 32 petition and identified as experts Professors Brad J. Bushman and John P. Murray. Doc. 14-71 at 162–75 ¶¶ 73–100; *id.* at 164–65 ¶ 83. The circuit court dismissed the claims. Doc. 14-74 at 201. Mr. Thompson raised both phases of the claim on collateral appeal, and the Alabama Court of Criminal Appeals affirmed. Doc. 14-76 at 2, 55–66, 90–92; *Thompson Collateral*, 310 So. 3d at 868–69, 877–82.

The Alabama Court of Criminal Appeals rejected the guilt-phase part of this argument based on its prior analysis (on direct appeal) of the trial court's pretrial

ruling. As the court explained, excluding the video-game theory as a defense was appropriate "because [it] had 'not gained general acceptance in the scientific community.'" *Thompson Collateral*, 310 So. 3d at 869 (quoting *Thompson ACCA Direct*, 153 So. 3d at 142). The court reasoned that counsel cannot perform deficiently "for failing to present [inadmissible] evidence," and upheld the summary dismissal of the claim. *Id.* (cleaned up).

As for the penalty-phase part of this argument, the Alabama Court of Criminal Appeals determined that Mr. Thompson "failed, in part, to meet his burden of pleading." *Id.* at 878. His allegations were inadequate because he "did not plead the contents of the expert's evidence that he maintain[ed] should have been presented." *Id.* Additionally, the court found that "counsel presented a great deal of mitigation" evidence in the penalty phase and agreed with the circuit court's summary dismissal. *Id.* at 882.

Mr. Thompson contends that the Alabama Court of Criminal Appeals "unreasonably applied *Wiggins* and *Strickland* to these facts and that resulted in an unreasonable decision in light of the facts and evidence." Doc. 33-1 at 32. Because *Wiggins v. Smith*, 539 U.S. 510, 514 (2003), and *Strickland* analyzed penalty-phase issues, these precedents do not suggest that the Alabama Court of Criminal Appeals unreasonably applied Supreme Court precedent when it rejected Mr. Thompson's

claims about this issue and the guilt phase of his trial. And Mr. Thompson has not identified evidence that undermines the ruling of the Alabama Court of Criminal Appeals about the inadmissibility of the video-game defense. *See* Doc. 33-1 at 32–40. Accordingly, Mr. Thompson has not carried his burden under Section 2254(d)(1) or (d)(2) as to the guilt-phase part of this claim.

As for the penalty-phase part of this claim, neither *Wiggins* nor *Strickland* clearly establishes that the Alabama Court of Criminal Appeals addressed this claim unreasonably. Mr. Thompson's counsel developed his mitigation case much more extensively than did counsel in *Wiggins*, who "failed to discover and present" powerful mitigation evidence. 539 U.S. at 534. The evidence omitted in *Wiggins* included evidence of the petitioner's "severe privation and abuse . . . while in the custody of his alcoholic, absentee mother;" "physical torment, sexual molestation, and repeated rape [while] . . . in foster care;" "time . . . spent homeless;" and "diminished mental capacities." *Id.* at 535. Accordingly, the Alabama Court of Criminal Appeals did not unreasonably apply *Wiggins* to the different facts here. As mentioned earlier, the Supreme Court rejected both prongs of the mitigation claim in *Strickland*. 466 U.S. at 698–99. Mr. Thompson does not develop how the mitigation outcome unfavorable to the prisoner in *Strickland* establishes that the Alabama Court of Criminal Appeals unreasonably applied that precedent in denying

the penalty-phase part of this claim. *See* Doc. 33-1 at 32–40. And the evidence Mr. Thompson references does not establish that the Alabama Court of Criminal Appeals relied on any unreasonable factual determination in rejecting the penalty-phase part of this claim. *See id.* Accordingly, Mr. Thompson cannot carry his burden under Section 2254(d)(1) or (d)(2) as to that part of this claim.

**6. *Strickland* Burglary Claims**

Mr. Thompson asserts that trial counsel provided ineffective assistance by failing to investigate and object to "evidence of an alleged burglary, unrelated to" the triple murder in Fayette. Doc. 15 at 24. Mr. Thompson raised this issue in his Rule 32 petition, and the circuit court dismissed it. Doc. 14-71 at 175–77 ¶¶ 101–05; Doc. 14-74 at 201. Mr. Thompson raised the claim on collateral appeal, and the Alabama Court of Criminal Appeals affirmed. Doc. 14-76 at 2, 73–75; *Thompson Collateral*, 310 So. 3d at 872. Citing its ruling on direct appeal, the Alabama Court of Criminal Appeals held that Mr. Thompson's "bad acts were properly admitted for the purpose of showing [his] motive and intent." *Id.* (citing *Thompson ACCA Direct*, 153 So. 3d at 134–37). Because the "underlying issue [of deficient performance] was addressed on direct appeal and found to have no merit," the court affirmed the dismissal of the collateral attack. *Id.*

Mr. Thompson now argues that the Alabama Court of Criminal Appeals based its decision on an unreasonable factual determination. Doc. 33-1 at 55. According to Mr. Thompson, "the site of [the] alleged burglary" was in Jasper, while he was discovered "asleep in the parking lot of the Triangle Grill in Fayette—[a distance of] forty miles[] [away]." *Id.* Mr. Thompson cites the State's opening statement at trial, Doc. 14-12 at 159–60, but that statement does not establish the "confusion in the record" that Mr. Thompson asserts. Doc. 33-1 at 55. In any event, the premise of Mr. Thompson's claim has to do with the trial court's evidentiary ruling about the burglary evidence, and Mr. Thompson has not established any unreasonableness in the appellate court's factual basis for its ruling about that. Because the trial court properly allowed the State to introduce bad acts evidence against Mr. Thompson, the Alabama Court of Criminal Appeals did not unreasonably find that his counsel could not "be ineffective for failing to raise a meritless issue." *Thompson Collateral*, 310 So. 3d at 872.

Additionally, Mr. Thompson asserts that trial counsel was ineffective for failing to object to the instruction allowing the jury to consider the burglary evidence "for purposes of motive or intent[] when the act itself had not been proven." Doc. 15 at 25; *see also* Doc. 33-1 at 53–54. Mr. Thompson raised this issue in his Rule 32 petition and on collateral appeal, Doc. 14-71 at 175–76 ¶ 102; Doc. 14-76 at 2, 74,

but the Alabama Court of Criminal Appeals did not expressly address it, *see Thompson Collateral*, 310 So. 3d at 872. Mr. Thompson made only a limited reference to the claim in his petition for a writ of certiorari, *see* Doc. 14-78 at 2, 67, and this claim is thus arguably unexhausted and procedurally defaulted.

But even if the claim is properly before this court, the failure of Mr. Thompson's counsel to object to this jury instruction does not provide a basis for *de novo* relief. This court's preceding analysis of the evidentiary objection claim also applies to the jury instruction objection claim. An objection to the jury instruction was meritless, and Mr. Thompson's counsel was not deficient for failing to make a baseless objection. Mr. Thompson also cannot show he was prejudiced by a jury instruction that referred to evidence that was properly introduced at trial.

**7. *Strickland* Venue Claim**

Mr. Thompson asserts that trial counsel provided ineffective assistance by failing to object to the trial court's *sua sponte* change of venue and advising him "to waive his right to a change of venue." Doc. 15 at 25–26. Mr. Thompson raised this issue in his Rule 32 petition, and the circuit court dismissed it. Doc. 14-71 at 177–201 ¶¶ 106–83; Doc. 14-72 at 2–17 ¶¶ 184-229; Doc. 14-74 at 201. Mr. Thompson raised the claim on collateral appeal, and the Alabama Court of Criminal Appeals affirmed. Doc. 14-76 at 2, 39–52; *Thompson Collateral*, 310 So. 3d at 864–66.

By way of background: Mr. Thompson's trial counsel sought a change of venue from Fayette County. Doc. 14-1 at 136. The State did not oppose that motion, acknowledging "that a significant amount of pre-trial publicity ha[d] occurred in th[e] case, sufficient [enough] that many members of the Fayette County community ha[d] heard about the facts of the case." *Id.* at 146 ¶ 3. The trial court transferred venue to non-adjacent Lauderdale County. *Id.* at 153. About six months later, the court rescinded that ruling *sua sponte* and transferred venue to Lamar County, a location adjacent to Fayette County. Doc. 14-2 at 45–46. The court explained that when it transferred venue to Lauderdale County, it assumed that Lamar and Fayette Counties were both "included in the Birmingham, Alabama, media market." *Id.* at 45. Because the court had since "determined that Lamar County [wa]s outside the Birmingham market," "to promote judicial economy and efficiency," the court transferred venue to Lamar County. *Id.* at 46–46. Like Fayette County, Lamar County is part of Alabama's Twenty-Fourth Judicial Circuit. *Id.* at 45.

The court held a hearing, and counsel objected to the transfer to Lamar County on the ground that the successive transfer violated Alabama law. Doc. 14-4 at 111–12. Under Alabama Code § 15–2–24, "[w]hen a change of venue is authorized, the trial must be removed to the nearest county free from exception, and it can be removed but once." The trial court rejected that argument on the ground that the

transfer to Lauderdale County was improper because Lamar County was "the nearest county, free from exception." Doc. 14-4 at 112–13. Mr. Thompson's trial counsel then objected and stated that rather than trying the case in Lamar County, Mr. Thompson would withdraw the motion to change venue and consent to trial in Fayette County. *Id.* at 113. Defense counsel sought to have Mr. Thompson state on the record that he did not object to a trial in Fayette County. *See id.* at 113–15. Mr. Thompson stated that he did have an objection. *Id.* at 115. Defense counsel then asked for a moment to confer with Mr. Thompson. *Id.* After an off-the-record conversation, counsel reported that Mr. Thompson's "inquiry" was unrelated to venue. *Id.* at 115–16. Again, defense counsel asked Mr. Thompson whether he had any objection to waiving his right to change venue. *Id.* at 116. Mr. Thompson shook his head "no." *See id.* Consistent with Mr. Thompson's waiver, the court ordered that the trial would be in Fayette County. *Id.*; Doc. 14-2 at 47–48.

The Alabama Court of Criminal Appeals determined that the "claim was insufficiently pleaded" for several reasons. *Thompson Collateral*, 310 So. 3d at 865. The court determined that Mr. Thompson had "waived his right to move for a change of venue," that the circuit court had considered the voluntariness of that waiver, and that Mr. Thompson had not cited "any facts showing that [the] waiver was involuntary or coerced." *Id.* The Alabama Court of Criminal Appeals also

determined that Mr. Thompson had not identified any juror "who was biased against him based on pretrial publicity." *Id.* Additionally, the Alabama Court of Criminal Appeals concluded that Mr. Thompson "would not have been entitled, as a matter of law, to a change of venue." *Id.* at 866. Accordingly, that court upheld summary dismissal because Mr. Thompson "failed to state a claim upon which relief could be granted." *Id.*

Mr. Thompson maintains that the Alabama Court of Criminal Appeals "unreasonably applied *Strickland* to these facts, and that resulted in an unreasonable decision in light of the facts and evidence." Doc. 33-1 at 21. Mr. Thompson also suggests that the court unreasonably applied *Wiggins*. *Id.* at 31.

But neither *Strickland* nor *Wiggins* involved an ineffective assistance claim based on venue issues so those precedents do not clearly establish any error in the analysis of the Alabama Court of Criminal Appeals. Mr. Thompson cites other Supreme Court decisions in his reply brief, but those precedents have the same defect—none involve ineffective assistance claims based on venue issues. *See, e.g.*, *Dunn v. Madison*, 583 U.S. 10, 11 (2017); *Lee v. United States*, 582 U.S. 357, 371 (2017); *Renico v. Lett*, 559 U.S. 766, 769 (2010); *Skilling v. United States*, 561 U.S. 358, 385 (2010); *Batson v. Kentucky*, 476 U.S. 79, 82–83 (1986); *Sheppard v. Maxwell*, 384 U.S. 333, 335 (1966); *Viereck v. United States*, 318 U.S. 236, 237

(1943). Accordingly, Mr. Thompson has not satisfied his burden under Section 2254(d)(1).

Mr. Thompson has not satisfied his burden under (d)(2), either. The court has reviewed Mr. Thompson's references to the state court record in his reply brief, and the context of those citations either lacks a nexus to or reinforces the factual findings underlying the ruling of the Alabama Court of Criminal Appeals. *See* Doc. 33-1 at 21–32. Mr. Thompon's citations do not suggest that the Alabama Court of Criminal Appeals based its decision on an erroneous factual finding, let alone an objectively wrong one.

**8. *Strickland* Jury Instruction Claims**

Mr. Thompson asserts that trial counsel was ineffective for failing to request two guilt-phase jury instructions and withdrawing another proposed instruction. Doc. 15 at 28. Mr. Thompson raised these issues in his Rule 32 petition, and the circuit court dismissed them. Doc. 14-72 at 17–20 ¶¶ 230–41; Doc. 14-74 at 201. Mr. Thompson raised the claims on collateral appeal, and the Alabama Court of Criminal Appeals affirmed. Doc. 14-76 at 2, 75–79; *Thompson Collateral*, 310 So. 3d at 872–73, 886–87.

Warden Raybon relies on AEDPA deference in defending the two unrequested jury instruction claims and did not address the withdrawn proposed

instruction. Doc. 26 at 33–34. Mr. Thompson does not explain how he overcomes AEDPA deference on the unrequested jury instructions, Doc. 33-1 at 57–60, so the court will not order habeas relief on those grounds. As for the withdrawn proposed instruction, Mr. Thompson contends that the Alabama Court of Criminal Appeals both did not address that claim and unreasonably applied *Strickland*. *Id.* at 60.

The withdrawn proposed instruction discussed a defendant's failure to testify. *Thompson Collateral*, 310 So. 3d at 886. On rehearing, the Alabama Court of Criminal Appeals determined that Mr. Thompson failed to satisfy Alabama Rule of Appellate Procedure 28(a)(10). *Thompson Collateral*, 310 So. 3d at 887. Rule 28(a)(10) requires "[a]n argument [to] contain[] the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). The Alabama Court of Criminal Appeals determined that because Mr. Thompson made only a "conclusory assertion that . . . counsel was ineffective for moving to withdraw that instruction" and did "not explain how the circuit court erred," he "waived the argument for purposes of appellate review." *Thompson Collateral*, 310 So. 3d at 887 (cleaned up). The court also ruled that Mr. Thompson did "not explain how . . . counsel's performance prejudiced him." *Id.* Thus, the appeals court dismissed this claim as waived. *Id.*

Ordinarily, the dismissal of a claim on adequate and independent state-law procedural grounds defaults that claim from habeas review. *Ward*, 592 F.3d at 1156. But here, Warden Raybon did not argue procedural default in his answer or brief. Doc. 24 at 13–14; Doc. 26 at 33–34. Accordingly, the court reviews the substance of the claim *de novo*.

Mr. Thompson is due no habeas relief on this claim. He admitted to a triple homicide but claimed that he was in a PTSD-induced dissociative state when he killed the victims. *Thompson ACCA Direct*, 153 So. 3d at 102. Because of that admission, counsel could have withdrawn the proposed jury instruction for a strategic reason—namely, to avoid confusing the jury. And in any event, Mr. Thompson's allegations do not establish a reasonable probability that but for counsel's decision to withdraw the instruction on a defendant's failure to testify, the outcome of his guilt-phase proceedings would have been different. Mr. Thompson has not alleged a link between any negative inference from his failure to testify and the jury's rejection of his PTSD-based defense to capital murder.

**9. *Strickland* Cross-Examination Claims**

Mr. Thompson asserts that trial counsel provided ineffective assistance by failing adequately to cross-examine two witnesses—Alabama Bureau of Investigation Agent Johnny Tubbs and Dr. Brent Willis. Doc. 15 at 29–30; Doc. 33-

1 at 49–53; *Thompson Collateral*, 310 So. 3d at 874–76. Mr. Thompson raised these issues in his Rule 32 petition, and the circuit court dismissed them. Doc. 14-72 at 20–24 ¶¶ 242–43, 245–46; Doc. 14-74 at 201. Mr. Thompson raised the claims on collateral appeal, and the Alabama Court of Criminal Appeals affirmed. Doc. 14-76 at 2, 80–84; *Thompson Collateral*, 310 So. 3d at 874–76.

The Alabama Court of Criminal Appeals upheld the summary dismissal of the claim involving Agent Tubbs because Mr. Thompson "failed to plead the 'full facts'" by failing to allege "what . . . counsel could have asked Agent Tubbs that would have been considered effective cross-examination." *Thompson Collateral*, 310 So. 3d at 875. The court reviewed the trial transcript and determined that counsel had "thoroughly cross-examined Agent Tubbs surrounding the circumstances of [Mr.] Thompson's statement." *Id.*

As for the cross-examination claim involving Dr. Willis, the Alabama Court of Criminal Appeals noted that Dr. Willis had evaluated Mr. Thompson's mental health and testified about several "incriminating statements . . . made during the evaluations." *Id.* Dr. Willis testified that Mr. Thompson disclosed "that he had done a lot of 'stupid stuff[;] . . . . broke into a lot of places[;]'" and "broke into a place[,] . . . got clothes[,] . . . stole a [Toyota] Camry [automobile,] and went home." *Id.* at 875 n.5. The Alabama Court of Criminal Appeals found that Mr. Thompson had

"failed to plead what counsel should have uncovered and what Dr. Willis should have testified to if asked by trial counsel." *Id.* at 876. And that court concluded that Mr. Thompson suffered "no prejudice" because his "confession was significantly more incriminating than were the statements he made to Dr. Willis." *Id.* (quoting *Thompson ACCA Direct*, 153 So. 3d at 147).

Mr. Thompson contends that the Alabama Court of Criminal Appeals based its decision on unreasonable factual determinations and an unreasonable application of *Strickland*. Doc. 33-1 at 49, 52–53. Mr. Thompson does not overcome AEDPA deference under Section 2254(d)(1) or (d)(2).

*Strickland* did not involve an allegation of ineffectiveness during cross-examination. Accordingly, Mr. Thompson's reliance on *Strickland* does not satisfy his burden under Section 2254(d)(1). As for his burden under Section 2254(d)(2), Mr. Thompson maintains that the Alabama Court of Criminal Appeals unreasonably overlooked the details he provided to support the claim involving Agent Tubbs. Doc. 33-1 at 52. And Mr. Thompson implies that the court unreasonably addressed his allegations about Dr. Willis because counsel failed to interview him before trial. *Id.* at 49–50.

But the Alabama Court of Criminal Appeals provided more than one explanation for rejecting Mr. Thompson's claims about Agent Tubbs and Dr. Willis

under Section 2254(d)(2). Mr. Thompson thus must establish that each rationale unreasonably conflicts with the evidentiary record. He has not done so. For example, he does not challenge the court's finding that counsel cross-examined Agent Tubbs "thoroughly" on the circumstances of the confessional statement. *Thompson Collateral*, 310 So. 3d at 875. Likewise, he does not contest the finding that any prejudice associated with Dr. Willis's testimony was negligible due to the "significantly more incriminating" contents of Mr. Thompson's confession. *Id.* at 876 (cleaned up). Accordingly, Mr. Thompson has not overcome the AEDPA deference attached to these determinations.

**10. *Strickland* Prosecutorial Misconduct Claims**

Mr. Thompson makes three claims of ineffective assistance involving his counsel's response to alleged prosecutorial misconduct. First, Mr. Thompson asserts that trial counsel provided ineffective assistance by failing to object to the prosecutor's comparison (in his guilt-phase closing argument) of Mr. Thompson's "spontaneous actions" to that of the "highly-orchestrated" September 11, 2001, terrorist attacks on the United States. Doc. 15 at 31. Mr. Thompson raised this issue in his Rule 32 petition, and the circuit court dismissed it. Doc. 14-72 at 25 ¶ 249; Doc. 14-74 at 201. Mr. Thompson raised the claim on collateral appeal, and the

Alabama Court of Criminal Appeals affirmed. Doc. 14-76 at 2, 85; *Thompson Collateral*, 310 So. 3d at 876.

The Alabama Court of Criminal Appeals rejected this claim for lack of deficient performance. *Thompson Collateral*, 310 So. 3d at 876 (citing *Thompson ACCA Direct*, 153 So. 3d at 158–76). That court reasoned that it evaluated this issue on direct appeal, "addressed the merits of the underlying claims of ineffective assistance of counsel[,] and found no error in any of the arguments made by the prosecutor." *Id.* The court concluded that because no prosecutorial misconduct occurred, "counsel could not be ineffective for failing to raise an argument that ha[d] no merit." *Id.*

In response to Warden Raybon's reliance on AEDPA deference, *see* Doc. 26 at 34–35, Mr. Thompson makes several arguments that encourage this court to conduct a *de novo* review, Doc. 33-1 at 61–63. This court lacks the authority to conduct such a review, and Mr. Thompson has failed to overcome AEDPA deference under Section 2254(d)(1) or (d)(2).

Second, Mr. Thompson asserts that trial counsel provided ineffective assistance by failing to object to the penalty-phase admission of certain incident reports from the Tuscaloosa County Jail. Doc. 15 at 31–32. Mr. Thompson raised this issue in his Rule 32 petition, and the circuit court dismissed it. Doc. 14-72 at

24–25 ¶ 248; Doc. 14-74 at 201. Mr. Thompson raised the claim on collateral appeal, and the Alabama Court of Criminal Appeals rejected the claim on rehearing on procedural grounds. Doc. 14-76 at 2, 84–85 n.26; *Thompson Collateral*, 310 So. 3d at 887.

More particularly, the Alabama Court of Criminal Appeals determined that Mr. Thompson's argument did not satisfy Alabama Rule of Appellate Procedure 28(a)(10) because he "did not explain with any particularity how the circuit court erred when it summarily dismissed this claim." *Thompson Collateral*, 310 So. 3d at 887. The court added that "even if" Mr. Thompson had argued the deficient performance prong sufficiently, he failed to "explain how his counsel's performance prejudiced him under *Strickland*." *Id.*

Because Warden Raybon did not raise the issue of procedural default as to this claim in his answer or brief, *see* Doc. 24 at 13–14; Doc. 26 at 34–35, this court conducts a *de novo* review.

Mr. Thompson's allegations are insufficient to plead deficient performance. Mr. Thompson raised his "ability to conform to prison life" as a non-statutory mitigating factor, and the behavioral evidence from the Tuscaloosa County Jail was relevant to evaluating this factor. Doc. 14-2 at 190. The trial court commented that authenticity was "a pretty good objection," Doc. 14-23 at 185, but that one remark

does not establish that the court would have sustained an authenticity-based objection to the exhibit, especially when Dr. Rosenzweig had already testified about the incident. *See id.*; Doc. 33-1 at 75. And even if Mr. Thompson's allegations are sufficient to state deficient performance, they are inadequate to plead that but for counsel's error, a reasonable probability of a different sentencing outcome exists. In the sentencing order, the court concluded that the aggravating circumstances "carr[ied] great weight" and "far outweigh[ed]" the mitigating factors. Doc. 14-2 at 190. The trial court gave no indication that the question was close, and this court agrees. Even if the trial court had credited Mr. Thompson with the ability to adjust to prison life, Mr. Thompson has not alleged any facts to support that such additional mitigation would be weighty enough to create a reasonable probability of a different penalty-phase result, particularly in the light of the strength of the aggravating evidence.

Third, Mr. Thompson asserts that trial counsel provided ineffective assistance in the penalty phase by failing to object to the prosecuting attorney's argument that he "stepped over the legs behind [Dispatcher] Mealer and shot him in the head." Doc. 33-1 at 62. Mr. Thompson appears to raise this claim for the first time in reply. *See* Doc. 15 at 29–33. And although he raised the issue in his Rule 32 petition and on collateral appeal, he did not include it in his petition for a writ of certiorari. *See*

Doc. 14-72 at 26 ¶ 250; Doc. 14-76 at 2, 85–86; Doc. 14-78 at 2, 81–83, 87–89. Accordingly, this claim is unexhausted and procedurally defaulted.

**11. *Strickland* Cumulative Effects Claim**

Mr. Thompson asserts that trial counsel provided ineffective assistance because of the cumulative effects of all errors. Doc. 15 at 32–33. Mr. Thompson raised this issue in his Rule 32 petition, and the circuit court dismissed it. Doc. 14-71 at 144 ¶ 20; Doc. 14-74 at 201. Mr. Thompson raised the claim on collateral appeal, and the Alabama Court of Criminal Appeals affirmed. Doc. 14-76 at 2, 87; *Thompson Collateral*, 310 So. 3d at 876–77.

The Alabama Court of Criminal Appeals accepted arguendo that a cumulative effects theory was a cognizable *Strickland* claim and determined that Mr. Thompson's "substantial rights had not been injuriously affected . . . [given the absence of attorney] error in the instances argued in the petition." *Thompson Collateral*, 310 So. 3d at 877 (cleaned up).

Warden Raybon does not address the cumulative allegation in his brief, but does reference the Alabama Court of Criminal Appeals' denial of the claim in his answer. *See* Doc. 26 at 34–35; Doc. 24 at 13–14. Mr. Thompson relies on *Williams* to argue that the court unreasonably rejected this claim. Doc. 33-1 at 64. But *Williams* is a penalty-phase decision, so it does not clearly establish the parameters

of a cumulative-effects claim based on alleged errors that impacted a guilt-phase outcome. Additionally, *Williams* concluded that counsel performed deficiently in investigating mitigation, 529 U.S. at 390–91, and the Alabama Court of Criminal Appeals determined that Mr. Thompson lacked any cognizable allegations of guilt-phase attorney error. Accordingly, *Williams* does not support this claim by Mr. Thompson.

**12. *Strickland* Mitigation Claim**

Mr. Thompson asserts that trial counsel provided ineffective assistance at sentencing by failing to present relevant mitigating evidence. Doc. 15 at 34–41. Generally, Mr. Thompson challenges counsel's failures to call his parents and other lay witnesses to testify, introduce evidence of the video-game theory, and admit DHR records in an organized manner. *Id.* Mr. Thompson raised this issue in his Rule 32 petition, and the circuit court dismissed it. Doc. 14-72 at 28–39; Doc. 14-74 at 201. Mr. Thompson raised the claim on collateral appeal, and the Alabama Court of Criminal Appeals affirmed. Doc. 14-76 at 2, 88–103; *Thompson Collateral*, 310 So. 3d at 877–82.

The Alabama Court of Criminal Appeals distinguished Mr. Thompson's case from cases in which "counsel presented no evidence in mitigation" because Mr. Thompson's "counsel called family members, friends, and a clinical psychologist[—

Dr. Rosenzweig—] as witnesses at the penalty phase." *Id.* at 879. The court summarized the mitigation testimony, including Dr. Rosenzweig's discussion of DHR records. *Id.* at 880–81. The court determined "that the vast majority of evidence" that Mr. Thompson alleged his parents, girlfriend, and high school teacher would have testified about "was presented . . . [in the] sentencing [phase] through the testimony of other witnesses." *Id.* at 878. Thus, the court found no actionable prejudice from failure to call these lay witnesses to testify. *See id.* at 882. The court addressed the inadequacies of Mr. Thompson's expert allegations, including "that counsel should have called . . . an expert to testify concerning the effects of playing violent video games." *Id.* at 877. Overall, the Alabama Court of Criminal Appeals concluded that the trial court correctly dismissed the *Strickland* mitigation claim because Mr. Thompson had "failed to present a claim upon which relief could be granted." *Id.* at 882. The court did not discuss Mr. Thompson's allegations that counsel failed to organize the DHR records, play the *60 Minutes* video, and introduce evidence of the causal connection between his exposure to video games and the murders.

Except for one allegation, Warden Raybon relies on AEDPA deference in opposing this claim. Doc. 26 at 35–40. On the excepted allegation, Warden Raybon argues that procedural default applies because Mr. Thompson did not present it in

state court. *Id.* at 38. Mr. Thompson disputes Warden Raybon's procedural default contention. *See* Doc. 33-1 at 73–74.

The court considers first the excepted allegation and two other allegations which the Court of Criminal Appeals did not discuss in its opinion. *See* Doc. 26 at 38–39. Those ineffectiveness allegations are "dumping . . . hundreds of pages of DHR records" on the jury; not introducing the *60 Minutes* video to support counsel's "statements about the impact of violent video games on viewers' behavior;" and not introducing evidence claiming that Mr. Thompson's "intensive exposure to violent video games had been causally related to" the murders. Doc. 15 at 39–41; Doc. 26 at 38. The third allegation is the one that Warden Raybon asserts is procedurally defaulted. Doc. 26 at 38. Although that allegation is missing from Mr. Thompson's Rule 32 petition, he raised it on collateral appeal and certiorari review. Doc. 14-76 at 2, 102; Doc. 14-78 at 2, 97. And the Alabama Court of Criminal Appeals did not reject the allegation as unpreserved for collateral review. *See Thompson Collateral*, 310 So. 3d at 877, 882. Because the Alabama Court of Criminal Appeals considered the allegation on the merits, the court treats the allegation as exhausted.

As for the allegations about the DHR records and the *60 Minutes* video, Warden Raybon maintains that AEDPA deference applies based on the trial court's summary dismissal of the allegations. Doc. 26 at 39–40. But, as previously noted,

that court dismissed all Rule 32 allegations collectively, and the Alabama Court of Criminal Appeals issued a "reasoned" decision for AEDPA purposes. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

AEDPA deference applies to all three allegations even though the Alabama Court of Criminal Appeals did not specifically address each one. The Eleventh Circuit has "rejected the proposition that a state court decision involves an unreasonable application of federal law and is not entitled to deference unless that court's opinion on its face shows its work by explicitly mentioning all relevant circumstances that the defendant argues in support of relief." *Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1350 (11th Cir. 2019) (cleaned up). That rule flows from "the Supreme Court's teaching that readiness to attribute error to a state court decision is incompatible with both the presumption that state courts know and follow the law and AEDPA's highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Id.* (cleaned up) ("stress[ing] that in applying AEDPA deference federal courts are not to take a magnifying glass to the state court opinion or grade the quality of it"); *see also Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1038 (11th Cir. 2022) ("[A]ny state court's written opinion is necessarily 'partial'; it will never perfectly and exhaustively capture every justification underlying the court's decision[.]").

Accordingly, the merits-based rejection of Mr. Thompson's mitigation claims by the Alabama Court of Criminal Appeals is not limited to only the allegations that court individually addressed.

This court previously discussed the Alabama Court of Criminal Appeals' merits-based rejection of Mr. Thompson's penalty-phase expert allegations in sections III.B.2, III.B.3, and III.B.5 and explained why he has not satisfied his AEDPA burden. Reweighing those and these mitigation allegations, Mr. Thompson has not established a basis for habeas relief. Specifically, Mr. Thompson has not proven that the Alabama Court of Criminal Appeals unreasonably "concluded that [Mr. Thompson] was not prejudiced by any of his counsel's alleged deficiencies in connection with his sentencing proceeding." *Pye*, 50 F.4th at 1030.

Mr. Thompson's reliance on *Strickland* to satisfy his burden under Section 2254(d)(1) falls short. The new evidence of mitigation in *Strickland* was far more detailed than the evidence Mr. Thompson argues about now. The *Strickland* evidence included "14 affidavits from friends, neighbors, and relatives," who would have been willing to testify as favorable character witnesses. 466 U.S. at 675. And even then, the Court rejected the ineffective assistance claim. *Id.* at 699–700 (concluding that the claim "fail[ed]" "doubl[y]"—under both the deficient performance and prejudice prongs). After explaining why counsel's performance

was not deficient, the *Strickland* Court commented that the claim's "lack of merit" was "even more stark" under the prejudice prong because the omitted mitigating evidence "would barely have altered the sentencing profile presented to the sentencing judge" and did not establish a reasonable probability of a different sentencing outcome. *Id.*

Likewise, Mr. Thompson has not carried his burden under Section 2254(d)(2) either. The Court of Criminal Appeals did not unreasonably discount this alleged mitigation evidence in deciding that a reasonable probability of a different sentencing outcome did not exist.

**13. *Batson* Claim**

Mr. Thompson argues that the State's use of four peremptory strikes to remove Black venire members was unconstitutional under *Batson*. Doc. 15 at 42–48. Mr. Thompson raised this issue on direct appeal, Doc. 14-66 at 2, 39–46, and the Alabama Court of Criminal Appeals rejected the claim. *Thompson ACCA Direct*, 153 So. 3d at 123–27.

*Relevant Background*

Approximately 178 prospective jurors comprised the venire. Doc. 14-12 at 138. Sixteen, or nine percent, of the panel members were Black; 162, or ninety-one percent were white (or non-Black). *See id.* When the trial court excused individuals

for hardship or cause, twelve Black venire members were excused. *Id.* Before the striking process began, seventy-three prospective jurors comprised the venire. *Id.* at 114. Four, or five percent, of the panel members were Black; sixty-nine, or ninety-five percent, were white. *See id.* The government used four of thirty-one, or 12.9 percent, of its peremptory strikes to remove all four remaining Black members of the venire. Doc. 14-66 at 40; Doc. 14-12 at 114–15; *Thompson ACCA Direct*, 153 So. 3d at 123. The jury was therefore all white. Doc. 14-66 at 39.

*Batson*

Striking a prospective juror from the venire "motivated in substantial part by discriminatory intent" violates the Equal Protection Clause. *See Foster v. Chatman*, 578 U.S. 488, 513 (2016) (cleaned up). Under *Batson*, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). A *Batson* challenge consists of three steps. In the first step, "the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005) (cleaned up).

At the second step, if a defendant makes a prima facie case the "burden [of production] shifts to the State to explain adequately the racial exclusion by offering

permissible race-neutral justifications for the strikes." *Id.* (cleaned up). Here, the plausibility of the justification does not matter, and "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett*, 514 U.S. at 768 (cleaned up).

In the third step, "the trial court must determine whether the defendant has shown purposeful discrimination" based on "the parties' submissions." *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003). "[T]he critical question [in this last stage] . . . is the persuasiveness of the prosecutor's justification for his peremptory strike." *Id.* at 338–39. Factors for making that credibility determination include "the prosecutor's demeanor; . . . how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy." *Id.* at 339. "[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Id.* (cleaned up). "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

The trial court determined that Mr. Thompson established a prima facie case and "directed the State to set out its reasons for removing the black jurors." *Thompson ACCA Direct*, 153 So. 3d at 123. "[T]he State provided its reasons," and "the circuit court found that the reasons for removing the black prospective jurors

were race-neutral." *Id.* On direct appeal, the Alabama Court of Criminal Appeals explained that because "more than one reason was given for striking some veniremembers, [it] . . . only [needed to] find one race neutral reason among those asserted to find that the strike was race-neutral; [and] . . . need not address any accompanying reasons that might be suspect." *Id.* at 124 (cleaned up). After reviewing each challenged strike, the Alabama Court of Criminal Appeals found no *Batson* error and rejected the claim. *Id.* at 125–27.

Mr. Thompson contends that the prosecutor's justifications are not credible and a pretext for race discrimination. *See* Doc. 33-1 at 80–85.

*Section 2254(d)(1) Analysis*

On habeas review, Mr. Thompson contends that the Alabama Court of Criminal Appeals unreasonably evaluated the allegation of purposeful discrimination. *See* Doc. 15 at 48; Doc. 33-1 at 80, 85. Mr. Thompson cites *Batson* and *Flowers v. Mississippi*, 588 U.S. 284 (2019), Doc. 33-1 at 80, but AEDPA deference was not an issue in either of those cases. Regardless, neither precedent demonstrates beyond debate that the Alabama Court of Criminal Appeals unreasonably rejected Mr. Thompson's *Batson* claim.

In *Batson*, the Supreme Court remanded the case "[b]ecause the trial court flatly rejected the [strike] objection without requiring the prosecutor to give an

explanation for his action." 476 U.S. at 100. *Batson* thus did not comment on the application of step three. *See id.* at 99–100 & n.24. Accordingly, *Batson* itself furnishes no basis for a finding that the Alabama Court of Criminal Appeals' step-three analysis was contrary to or an unreasonable application of clearly established law. *See* Doc. 33-1 at 85.

The *Flowers* Court considered four categories of evidence that "loom[ed] large" on the issue of the prosecutor's discriminatory intent. 588 U.S. at 304. Those categories were:

> (1) the history from Flowers' six trials, (2) the prosecutor's striking of five of six black prospective jurors at the sixth trial, (3) the prosecutor's dramatically disparate questioning of black and white prospective jurors at the sixth trial, and (4) the prosecutor's proffered reasons for striking one black juror (Carolyn Wright) while allowing other similarly situated white jurors to serve on the jury at the sixth trial.

*Id.* The Supreme Court described these facts as "extraordinary" and concluded that a *Batson* violation had occurred. *Id.* at 288.

Mr. Thompson's case is fundamentally unlike *Flowers*. Mr. Thompson's evidence of discriminatory intent does not include multiple trials involving the same prosecutor. *See id.* at 316 (Alito, J. concurring). Nor does it include a collection of former *Batson* and prosecutorial misconduct issues, as were present in *Flowers*. *See*

*id.* Nor does it include "dramatically disparate questioning" of Black and white members of the venire. *Id.* at 288. Because of those differences, Mr. Thompson cannot satisfy his burden under Section 2254(d)(1) by relying on *Flowers*.

Mr. Thompson mentions *Snyder v. Louisiana*, 552 U.S. 472 (2008), in his petition. Doc. 15 at 42. In *Snyder*, "5 of the 36 [potential jurors] were black," and the prosecutor used peremptory strikes to remove "all 5." 552 U.S. at 476. As a result, the Black petitioner "was tried by an all-white jury." *State v. Snyder*, 942 So. 2d 484, 486 (La. 2006), *rev'd on other grounds*, 552 U.S. at 486. The petitioner in *Snyder* focused on two stricken jurors to support his *Batson* claim—Jeffrey Brooks and Elaine Scott. 552 U.S. at 477.

One reason the prosecutor offered to support striking Mr. Brooks was that he "looked very nervous . . . throughout the questioning." *Id.* at 478 (cleaned up). The second was tied to Mr. Brooks's role as "a student teacher" and his concern about "miss[ing] class" because of jury service. *Id.* (cleaned up). According to the prosecutor, this employment created a risk that Mr. Brooks "might, to go home quickly, come back with guilty of a lesser verdict so there wouldn't be a penalty phase." *Id.* (cleaned up). The *Snyder* Court determined that the first reason lacked support in the record, and the second one was pretextual and incredible. *See id.* at 479, 485.

On the nervousness explanation, the gap in the record was that "the trial judge simply allowed the challenge without explanation" and made no "specific finding . . . concerning Mr. Brooks'[s] demeanor." *Id.* at 479. The Supreme Court explained that the silence could have meant that the judge lacked a recollection of Mr. Brooks's demeanor or "found it unnecessary to consider [that first reason], instead basing his ruling completely on the second proffered justification for the strike." *Id.* Thus the *Snyder* Court could not "presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous" and considered the second reason. *Id.*

As for the "student-teaching obligation," "Mr. Brooks was 1 of more than 50 members of the venire who expressed concern that jury service or sequestration would interfere with work, school, family, or other obligations." *Id.* at 479–80. After learning—through court staff—that being away from work for one week of service was not "a problem" for the dean of the university and a "work[able]" situation, "Mr. Brooks did not express any further concern about serving on the jury." *Id.* at 481. Nor did the "prosecut[or] . . . choose to question [Mr. Brooks] more deeply about this matter." *Id.* The prosecutor struck Mr. Brooks peremptorily the day after the discussion about his potential student-teaching conflict, and the penalty phase concluded "by the end of the week." *Id.*

The Supreme Court concluded that the prosecutor's "claimed . . . apprehensi[on]" that Mr. Brooks might have had a motivation to cut short the capital proceedings was "highly speculative." *Id.* at 482. The *Snyder* Court determined that the prosecutor's second explanation was dubious because he "anticipated on the record during *voir dire*" that the petitioner's trial would be short. *Id.* The Court discussed how "the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear[ed] to have been at least as serious as Mr. Brooks[']s]" demonstrated the implausibility of the student-teacher reason. *Id.* at 483. The Court thus concluded that "a discriminatory intent was a substantial or motivating factor" in the prosecutor's strike of Mr. Brooks and ruled that the collective circumstances did not warrant a remand on the "subtle question" of the prosecutor's discriminatory intent as a "determinative" factor, "more than a decade after petitioner's trial." *Id.* at 485–86. Because "the explanation given for the strike of Mr. Brooks [wa]s by itself unconvincing," there was no need "to consider the strike of Ms. Scott." *Id.* at 478.

*Snyder* illustrates how a facially-neutral explanation for a strike may lack support in the record. But *Snyder* does not clearly establish that the Alabama Court of Criminal Appeals unreasonably applied Supreme Court precedent in rejecting Mr. Thompson's *Batson* claim. In *Snyder*, the Supreme Court considered both

explanations for striking Mr. Brooks because of the uncertain record on the nervousness reason. In Mr. Thompson's case, the Alabama Court of Criminal Appeals determined that based on the record, each contested strike had at least one non-pretextual explanation that was race-neutral.

Mr. Thompson also cites *Miller-El v. Dretke*, 545 U.S. 231 (2005). Doc. 15 at 42. There, evidence of the prosecutor's discriminatory intent went "beyond [racial] comparison [in jury strikes] to include broader patterns of practice during the jury selection." 545 U.S. at 253. The evidence reflected that the prosecutor engaged in varying degrees of questioning about the death penalty and "minimum acceptable sentences," depending on a prospective juror's race. *Id.* Additionally, the prosecutor's "general policy . . . to exclude black venire members from juries at the time" of the petitioner's trial "confirmed" "the appearance of [the prosecutor's] discrimination." *Id.* Thus, the evidence of discriminatory intent in *Miller-El* far exceeds what Mr. Thompson presented. Accordingly, *Miller-El* does not indicate that the Alabama Court of Criminal Appeals unreasonably applied clearly established law.

Mr. Thompson also cites *Powers v. Ohio*, 499 U.S. 400, 411–14 (1991). *Powers* holds "that a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race," even

when the defendant's "race differs from that of the excluded jurors." *Id.* at 415. The Alabama Court of Criminal Appeals could not have unreasonably applied *Powers* in Mr. Thompson's case because he is contesting the removal of jurors who share his race.

Mr. Thompson claims "[t]he State court also did not consider the racial dynamics at trial" when evaluating the proffered reasons for the contested strikes, noting that "[t]his is an interracial crime where Mr. Thompson is African American and was charged with shooting two Fayette police officers and a dispatcher, two of whom were white." Doc. 15 at 46–47. He cites *Johnson v. California*, 545 U.S. at 167, and *Turner v. Murray*, 476 U.S. 28, 33 (1986), in support of this claim.

The trial court in *Johnson* "did not ask the prosecutor to explain the rationale for his strikes," and *Johnson* involves only the first step of the *Batson* analysis. *Johnson v. California*, 545 U.S. at 165. *Johnson* is thus not on point, and the Alabama Court of Criminal Appeals did not unreasonably apply *Johnson* to Mr. Thompson's *Batson* claim.

*Turner v. Murray* was decided on the same day as *Batson* but does not apply the three-step analysis. *See Turner v. Murray*, 476 U.S. 28. *Turner* holds "that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." *Id.* at

36–37. The voir dire at issue in *Turner* was inadequate because the trial judge refused to question the venire about racial bias. *Id.* at 30–31, 37. Mr. Thompson's claim is different, and the Alabama Court of Criminal Appeals thus did not unreasonably apply *Turner*.

Finally, *Davis v. Ayala*, 576 U.S. 257 (2015), suggests that the Alabama Court of Criminal Appeals did not unreasonably deny Mr. Thompson's *Batson* claim. *See* Doc. 33-1 at 112. The prosecutor in *Davis* offered two race-neutral reasons to support a strike. 576 U.S. at 274–75. On review, the Supreme Court found that the first reason was a race-neutral reason. *Id.* The Court then explained that although it was not necessary to consider the additional reason, the additional reason likewise was a valid, race-neutral reason. *Id.* at 275.

An unreasonable application occurs when a state court "blunder[s] so badly" in rejecting a constitutional claim that no fairminded jurist could agree with the decision. *Mays v. Hines*, 592 U.S. 385, 392 (2021). Mr. Thompson has not established any such mistake by the Alabama Court of Criminal Appeals.

*Section 2254(d)(2) Analysis*

The court next evaluates whether Mr. Thompson has satisfied his burden under Section 2254(d)(2) with respect to his *Batson* claim. "[A] federal habeas court can only grant [relief] if it was unreasonable to credit the prosecutor's race-neutral

explanations for the *Batson* challenge." *Rice*, 546 U.S. at 338. To establish unreasonableness, Mr. Thompson must establish that the state court based its finding of no purposeful discrimination on objectively wrong facts. *See* 28 U.S.C. § 2254(d)(2).

In this analysis, "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice*, 546 U.S. at 338–39 (quoting 28 U.S.C. § 2254(e)(1)). To overcome the presumptively correct *Batson* findings, Mr. Thompson must present clear and convincing evidence that his competing facts "are 'highly probable.'" *See Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).

Even the presence of "a clearly erroneous factual determination . . . doesn't necessarily mean the state court's 'decision' was 'based on' an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Pye*, 50 F.4th at 1035 (quoting 28 U.S.C. § 2254(d)(2)). The critical deferential measure is how "importan[t] . . . the factual error [was] to the state court's ultimate 'decision.'" *Id.* (cleaned up). A "decision might still be reasonable 'even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (cleaned up).

Mr. Thompson must establish that the Alabama courts unreasonably assessed the evidence of purposeful discrimination under all the relevant circumstances. Relevant circumstances include evidence of pretext in the prosecutor's race-neutral explanations for challenged strikes, *see Miller-El*, 545 U.S. at 241, and the prosecutor's pattern of eliminating all Black members of the venire from the jury, *see Snyder*, 552 U.S. at 476.

Mr. Thompson also argues that this case involves interracial aspects—Mr. Thompson is Black, Officers Crump and Strickland were white, and Dispatcher Mealer was Black. Warden Raybon argues that this allegation is procedurally defaulted because Mr. Thompson did not rely on it in the *Batson* hearing or present it to the Alabama Court of Criminal Appeals. Doc. 26 at 46 (quoting Doc. 15 at 45–47). Mr. Thompson did not raise the issue in his brief on direct appeal, Doc. 14-66 at 39–46, and his reply brief in this court does not rebut Warden Raybon's assertion of procedural default, *see* Doc. 33-1 at 80–85. Accordingly, the argument is defaulted and this court does not consider it.

The court now considers the Alabama Court of Criminal Appeals' assessment of each challenged strike.

*1. Juror R.B.*

The prosecutor's reasons for striking Juror R.B. included her "stat[ing] during voir dire that she 'did not believe in killing,' . . . killing went against the Bible, and . . . the death penalty should never be imposed. R.B. also . . . knew [Mr.] Thompson's father because he was a member of her church and . . . her ex-boyfriend worked for [Mr.] Thompson's father." *Thompson ACCA Direct*, 153 So. 3d at 125. The prosecutor noted also that R.B. had a criminal charge for negotiating a worthless instrument. *Id.* A final explanation—which the trial court excluded from its consideration—was based on the police chief's opinion that "R.B. would not be a good juror because she did not like the police." *Id.* & n.12.

Mr. Thompson's counsel argued that two of these reasons were pretextual because "other jurors who had worthless-check convictions and who had reservations about the death penalty were not struck." *Id.* But counsel did not "identify any jurors who . . . had been treated differently." *Id.* Accordingly, the Alabama Court of Criminal Appeals concluded that "[t]he reasons for striking juror R.B. were race neutral and did not violate *Batson*." *Id.*

Warden Raybon relies on AEDPA deference to defend this challenged strike, *see* Doc. 24 at 16; Doc. 26 at 40–46, and Mr. Thompson offers no (d)(2) arguments about Juror R.B. on reply. Mr. Thompson therefore has forfeited this issue on habeas review.

*2. Juror W.H.*

The prosecutor's reasons for striking Juror W.H. included her writing "on her juror questionnaire that she knew [Mr.] Thompson and that she could 'not do this' but indicat[ing] during voir dire that she had changed her mind and now thought she could 'do it.'" *Thompson ACCA Direct*, 153 So. 3d at 125. The prosecutor noted that Juror W.H. "knew one of the police officers who was expected to testify" and that Juror W.H. commented during voir dire "don't ask me about him." *Id.* Other explanations for the strike were that Juror W.H. "went to school with [Mr.] Thompson;" her stepfather and Mr. Thompson's father "'hung out together;'" the district attorney's office had prosecuted her for harassment; and she had "'rolled her eyes'" at the prosecutor when he passed by her. *Id.*

Mr. Thompson's "counsel questioned the prosecutor's reasons for striking W.H., and the judge indicated that he had heard W.H.'s comment about one of the police officers." *Id.*

In its review of this strike, the Alabama Court of Criminal Appeals relied on *Thaler v. Haynes*, 559 U.S. 43, 48 (2010), for the rule on demeanor-based strikes: When demeanor is an explanation, "the judge should take into account, among other things, any observations of the juror that the judge was able to make during the voir dire." *Thompson ACCA Direct*, 153 So. 3d at 126 (quoting *Thaler*, 559 U.S. at 48).

Further, the Alabama Court of Criminal Appeals explained that *Batson* did not "'hold that a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor.'" 153 So. 3d at 126 (quoting *Thaler*, 559 U.S. at 48). The Alabama Court of Criminal Appeals concluded that "[t]he prosecutor's reasons for removing juror W.H. were race neutral and did not violate *Batson*." *Id.*

Mr. Thompson identifies part of the record that undercuts the prosecutor's stated reason for striking Juror W.H.—namely, that she "did not nod her head" on a question about the death penalty. Doc. 33-1 at 84. Mr. Thompson points out that the record reflects that all "[p]rosepctive jurors nod[ded] affirmatively" when the prosecutor asked if the panel members all agreed, "[b]y not raising [their] hand[s]," that "the death penalty has a place in our judicial system." Doc. 14-10 at 90.

As a matter of law, "a prosecutor's mistaken belief about a juror . . . [does not] provide[] 'clear and convincing' evidence of pretext." *Parker v. Allen*, 565 F.3d 1258, 1271 (11th Cir. 2009). Additionally, Mr. Thompson does not clearly and convincingly refute the finding of the Alabama Court of Criminal Appeals that Juror W.H.'s "comment about one of the police officers" was a non-pretextual justification for striking her. *See* Doc. 33-1 at 82–85. Mr. Thompson contends that the prosecutor should have questioned Juror W.H. further about the comment, *see id.* at 83, but a

prosecutor's "failure to ask a voir dire question [does not] provide[] 'clear and convincing' evidence of pretext." *Parker*, 565 F.3d at 1271. Further, Mr. Thompson questions the validity of the prosecutor's race-neutral explanation that Juror W.H. "rolled her eyes" at him. Doc. 33-1 at 84. But Mr. Thompson does not refute that justification or offer evidence that it was pretextual. *Id.* Accordingly, Mr. Thompson has not shown that the factual determinations underlying the appellate court's ruling affirming the overall finding of no purposeful discrimination were unreasonable.

*3. Juror C.N.*

The prosecutor's reasons for striking Juror C.N. included that she knew Mr. Thompson and had attended school with him. *Thompson ACCA Direct*, 153 So. 3d at 126. The prosecutor noted also that she "had almost completed a degree with a major in human development or childhood development." *Id.* According to the prosecutor, this educational background caused concern because of the anticipated expert testimony in this case. *See id.* The prosecutor elaborated that the State "did not want her to be basing her decision on anything other than the evidence." *Id.*

When Mr. Thompson's counsel objected, the trial court "asked the State to list the jurors, both white and black, that it had struck because they knew [Mr. Thompson]." *Id.* After creating a list of those prospective jurors, the prosecutor "stated . . . [he] would have struck all of them but defense counsel had struck some

of the jurors before the State could strike them." *Id.* The Alabama Court of Criminal Appeals found that "no evidence of disparate treatment [existed] in removing jurors based on [their knowing Mr. Thompson]." *Id.*

Mr. Thompson maintains that "the prosecutor's reasons for striking [Juror C.N.] were not applied equally against white jurors." Doc. 33-1 at 82. Mr. Thompson points to two white jurors who "were not struck despite their acquaintance with [Mr.] Thompson's father." *Id.* But this comparison does not establish pretext or an unreasonable factual determination. The prosecutor's justification was that he struck all prospective jurors who knew Mr. Thompson, except for those struck by Mr. Thompson's counsel. The two white jurors Mr. Thompson identified were acquainted with his father. Mr. Thompson has not established that the Alabama Court of Criminal Appeals relied on an unreasonable factual determination in rejecting this *Batson* challenge.

*4. Juror R.N.*

The prosecutor's reasons for striking Juror R.N. included her knowing Mr. Thompson; having children who had been prosecuted by the district attorney's office; and "answer[ing] on her questionnaire that she did not have a relative who had been accused of a crime," but stating in voir dire that her brother "had been convicted of selling drugs." *Thompson ACCA Direct*, 153 So. 3d at 126–27. That

same brother "was also a member of the venire for [Mr.] Thompson's trial." *Id.* at 127. The prosecutor expressed concern that Juror R.N. might "'harbor some resentment'" against the State "'because of the numerous times that [her brother] was put on the spot, and even laughed about by the panel during th[e] process.'" *Id.* The trial court determined that the conviction-based explanation applicable to Juror R.N.'s brother was race-neutral and did not apply to other prospective jurors. *Id.* The Alabama Court of Criminal Appeals concluded that "[t]he circuit court's denial of [Mr.] Thompson's *Batson* motion was not clearly erroneous." *Id.*

The trial court credited the prosecutor's justification based on Juror R.N.'s brother's conviction—a reason inapplicable to other members of the venire. Mr. Thompson has not established that this reason was pretextual—he has identified no evidence to that effect. *See* Doc. 33-1 at 83–84. Likewise, Mr. Thompson has not proven that the Alabama Court of Criminal Appeals relied on unreasonable factual determinations in affirming the trial court ruling.

Ultimately, Mr. Thompson has not established that under all the relevant circumstances, the Alabama Court of Criminal Appeals rejected his claims of purposeful discrimination based on unreasonable factual determinations.

**14. Venue Claim**

Mr. Thompson asserts that the trial court's decision to allow trial to proceed in Fayette County was unconstitutional because of prejudicial pretrial publicity. Doc. 15 at 48–55. Mr. Thompson raised this issue on direct appeal, Doc. 14-66 at 2, 110–13, and the Alabama Court of Criminal Appeals rejected it, *Thompson ACCA Direct*, 153 So. 3d at 103–05.[2]

The Alabama Court of Criminal Appeals noted that Mr. Thompson had "not present[ed] evidence indicating that pretrial publicity had saturated Lauderdale County or Lamar County." *Id.* at 104. And because Mr. Thompson withdrew his motion to change venue (to avoid Lamar County), the Alabama Court of Criminal Appeals determined that Mr. Thompson had invited any error. *Id.* The court evaluated whether any presumed prejudice or actual prejudice existed. *Id.* at 104–05. Because Mr. Thompson's venue motion in the trial court lacked any supporting evidence, *id.* at 105, the Alabama Court of Criminal Appeals found that without

[2] In reply, Mr. Thompson appears to have added a claim which he did not allege in his petition. *See* Doc. 33-1 at 87. Mr. Thompson argues that the trial court failed to exclude the media from the pretrial proceedings and seal the trial record. *Id.* But Mr. Thompson has not sought to add this claim to his petition under Federal Rule of Civil Procedure 15(a)(2) ("In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave."). Additionally, Warden Raybon has not had the opportunity to respond to it. Consequently, those allegations are not properly before the court and cannot support habeas relief.

"newspaper articles or transcripts of media coverage to review on appeal," presumed prejudice did not exist. *Id.* The court also found no evidence of actual prejudice because the voir dire transcript indicated that "those [with] a fixed opinion were struck for cause." *Id.* at 105. And "[o]ther jurors [who had heard about the case] indicated that they could set aside their opinions and render a fair decision based on the evidence presented in the case." *Id.*

Warden Raybon relies on procedural default to defend this claim. Doc. 26 at 47. He maintains that because the Alabama Court of Criminal Appeals determined that Mr. Thompson invited any error, dismissal on procedural default grounds is appropriate. *Id.* But the Alabama Court of Criminal Appeals did not present its merits-based analysis as an alternative reason to reject the venue claim. *See Thompson ACCA Direct*, 153 So. 3d at 103–05. Accordingly, the invited error doctrine is not an adequate and independent basis to support procedural default on habeas review. Accordingly, and because AEDPA deference is not waivable, *Rambaran v. Sec'y, Dep't of Corr.*, 821 F.3d 1325, 1331–32 (11th Cir. 2016), the court reviews the venue claim on the merits.

To overcome AEDPA deference on presumptive prejudice, Mr. Thompson contends that the Alabama Court of Criminal Appeals unreasonably applied *Sheppard*, *Rideau v. Louisiana*, 373 U.S. 723 (1963), and *Skilling*. Doc. 33-1 at 85–

88; Doc. 15 at 54. *Skilling* does not help Mr. Thompson. The *Skilling* Court concluded that "Skilling's trial, in short, shares little in common with those in which [the Court] approved a presumption of juror prejudice." 561 U.S. at 384. And the evidentiary records of prejudice in *Sheppard* and *Rideau* are unlike Mr. Thompson's case. *See Sheppard*, 384 U.S at 354, 358 (discussing "months [of] virulent publicity about [the petitioner] and the murder" pretrial which "made the case notorious" and the "carnival atmosphere" which pervaded the trial); *Rideau*, 373 U.S. at 727 (recognizing that the relevant community "saw and heard, not once but three times, a 'trial' of [the petitioner] in a jail, presided over by a sheriff, where there was no lawyer to advise [him] of [the] right to stand mute"). Although Mr. Thompson points out that he attached evidence to his Rule 32 petition to support presumptive prejudice, that information was not presented to the trial court or the Alabama Court of Criminal Appeals on direct review. *See* Doc. 33-1 at 87–88. And AEDPA limits this court's review "to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Further, Mr. Thompson has not identified clearly established authority that treats a state's willingness to consent to a venue change as evidence sufficient to establish a presumptively-prejudicial venue. *See* Doc. 33-1 at 87.

**15. *Brady* Claim**

Mr. Thompson asserts that the State's failure to disclose Dr. Willis's notes and Agent Tubbs's drafts was unconstitutional under *Brady v. Maryland*, 373 U.S. 83 (1963). Doc. 15 at 55–57. Mr. Thompson raised the former *Brady* issue on direct appeal, but he did not raise the latter. *See* Doc. 14-66 at 2, 46–51. The Alabama Court of Criminal Appeals denied the claim. *Thompson ACCA Direct*, 153 So. 3d at 144–45.

As the Alabama Court of Criminal Appeals correctly explained, "[u]nder *Brady* the good faith of the prosecutor in not disclosing information is irrelevant, [but] *Brady* does require that the information requested be known to the prosecution." 153 So. 3d at 144 (cleaned up). Additionally, "that knowledge may be presumed, as when the information is in the prosecutor's files." *Id.* at 144–45 (cleaned up). Because "no evidence [existed] indicating that the State knew about the information in Dr. Willis's notes, nor was there any evidence from which that knowledge could be imputed to the State or presumed," the Alabama Court of Criminal Appeals concluded that no *Brady* violation had occurred. *Id.* at 144.

As an initial matter, Mr. Thompson is due no habeas relief based on his *Brady* allegations about Agent Tubbs. Mr. Thompson did not properly exhaust those allegations. *See* Doc. 14-66 at 2, 46–51; Doc. 14-69, at 2, 47–55. Likewise, Mr.

Thompson did not properly exhaust his claim concerning the prosecutor's files on voir dire. *See* Doc. 15 at 57; Doc. 14-66 at 2, 46–51; Doc. 14-69, at 2, 47–55. Accordingly, those allegations are procedurally defaulted.

As for the exhausted portion of the claim about Dr. Willis, Mr. Thompson contends that the Alabama Court of Criminal Appeals unreasonably applied *Brady*. Doc. 33-1 at 92–93; 153 So. 3d at 144–45. But Mr. Thompson has not proven how that *Brady* application and outcome were objectively wrong. Mr. Thompson contends that "the State had [Dr. Willis's notes] in its possession for at least several days before [that information] was elicited in trial," Doc. 33-1 at 93, but he does not identify where this contradictory fact appears in the record. Accordingly, he has not overcome AEDPA deference under Section 2254(d)(2).

**16. Guilt-Phase Prosecutorial Misconduct Claim**

Mr. Thompson asserts that his conviction is unconstitutional because it was the result of prosecutorial misconduct. Doc. 15 at 58–63. Mr. Thompson raised this issue on direct appeal, Doc. 14-66 at 2, 62–68, and the Alabama Court of Criminal Appeals rejected it, *Thompson ACCA Direct*, 153 So. 3d at 157–61.

The Alabama Court of Criminal Appeals correctly commenced its analysis by determining whether the challenged remarks by the prosecutor were improper. *Thompson ACCA Direct*, 153 So. 3d at 157. And the court correctly recited that "the

test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict." *Id.* (cleaned up). Because Mr. Thompson did not object to the prosecutor's comments at trial, the Alabama Court of Criminal Appeals reviewed each statement for plain error. *Id.* at 158. The version of Alabama Rule of Appellate Procedure 45A applicable during Mr. Thompson's direct appeal provided:

> In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.

Ala. R. App. P. 45A (1978) (amended 2023). In its review, the Alabama Court of Criminal Appeals considered several jury instructions given by the trial court, including an instruction that what the attorneys argue is not evidence in the case. *Thompson ACCA Direct*, 153 So. 3d at 158.

The Alabama Court of Criminal Appeals found no error in most of the statements Mr. Thompson challenged as improper. As for the prosecutor's reference to September 11, 2001, in closing, the court found that "[t]he prosecutor [ha]d not compare[d] [Mr.] Thompson to a terrorist; he merely stated what every juror knew: that the triple homicide was a tragedy for the community of Fayette." *Id.* at 159. As

for the prosecutor's remarks encouraging the jury members to "'do [their] jobs,'" the court explained that "the prosecutor did not argue that the jurors should ignore the law but that the jurors should evaluate all the evidence." *Id.* And the court found that the "comment on the strength of the State's case" was "a proper subject for closing argument." *Id.* at 160.

Separately, Mr. Thompson argued that "the prosecutor improperly vouched for the veracity of Agent Johnny Tubbs." *Id.* The evidence reflects that the prosecutor said the following to the jury:

> [Defense counsel] said that Agent Tubbs went over there to get him, basically. [Defense counsel] told you that, that he went over there to try to—didn't go over there to help him. I admit that, he didn't go to help. [Defense counsel] wants you to believe he went over there to get him, get him to say things and put things in his mind that would help y'all convict him. That's not what Agent Tubbs said. When asked specifically, when hammered about that by [defense counsel] he said, 'I went over there to find out what happened.' You remember that Mr. Tubbs had only—he came up here and went into the police department, saw the bodies lying there and then, immediately, was told to go over there and take a statement from this defendant who had been caught.... How do you know that this was the statement of the defendant based upon his accurate recollection of the events? Well, first of all, Johnny Tubbs told us. Now, if there was evidence in here that Johnny Tubbs is a liar, if there was evidence in here that he had been fired from his job for lying, or that he wasn't worthy of belief under oath, that somehow his credibility had been attacked, then, sure,

> I wouldn't be standing up here taking up for him. I wouldn't be standing up here arguing on his behalf. But there is no question of his credibility before you.
>
> Johnny Tubbs is an ABI [Alabama Bureau of Investigation] agent. Do you know what happens to ABI agents that make up statements? They get fired. They get prosecuted if they commit perjury in courts. They go to jail. There is no evidence that this man has ever lied under oath about anything that he did. His credibility is not at issue here. He told you. He told you what happened.

*Id.* at 160–61.

In its review of these remarks, the Alabama Court of Criminal Appeals cited (1) cases distinguishing between vouching for a State's witness and arguing that a State's witness was credible based on the trial testimony, as well as persuasive precedent addressing a similar claim and concluding that some instances of improper vouching were not reversible error. *Id.* at 161. The court ultimately concluded that it "scrupulously reviewed the arguments made by counsel in the guilt-phase closing arguments and [is] confident that none of the arguments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

Mr. Thompson maintains that he overcomes AEDPA deference because the Alabama Court of Criminal Appeals unreasonably applied *Darden* and *United States v. Young*, 470 U.S. 1 (1985). Doc. 33-1 at 98. But neither *Darden* nor *Young* are

sufficiently similar to Mr. Thompson's case. In *Darden*, the prosecutorial errors did not result in guilt-phase habeas relief. *See* 477 U.S. at 183 ("Darden's trial was not perfect—few are—but neither was it fundamentally unfair." (cleaned up)). Although the *Young* Court found that the prosecutor had commented improperly, his argument "did not constitute plain error warranting the Court of Appeals to overlook the failure of the defense counsel to preserve the point by timely objection; nor . . . [did] the challenged argument seriously affect[] the fairness of the trial." 470 U.S. at 20. And Mr. Thompson fails to offer any record evidence that contradicts the factual determinations by the Alabama Court of Criminal Appeals. *See* Doc. 33-1 at 98. Accordingly, Mr. Thompson cannot overcome AEDPA deference and is not entitled to habeas relief.

**17. Confession and Other Statement Claims**

Mr. Thompson asserts that his conviction is unconstitutional because his confession to Agent Tubbs and other incriminating statements to law enforcement were inadmissible at trial. Doc. 15 at 63–67. With one exception,[3] Mr. Thompson

[3] Mr. Thompson does not contest that he failed to properly exhaust his argument that he was not informed that his mother was at the police station or allowed to see her. *See* Doc. 15 at 65. He does not seek to excuse that procedural default either. *See* Doc. 33-1 at 106–10. Consequently, Mr. Thompson has forfeited the procedural default issue and cannot rely on that contention to support habeas relief.

raised these issues on direct appeal, Doc. 14-66 at 2, 127–29, and the Alabama Court of Criminal Appeals rejected them, *Thompson ACCA Direct*, 153 So. 3d at 108–14.

Mr. Thompson argued that the trial court should have suppressed his confession and a supplementary statement of his remarks to Agent Tubbs because those statements were involuntary. *Id.* at 108–10. The facts on which Mr. Thompson relied to prove involuntariness were: "he was only 18 years old at the time he confessed, his mental impairment [from PTSD] rendered him incapable of making a voluntary confession, he was alone with police for 3 hours in a small room, and the transcript of the confession was Agent Tubbs's version of what [Mr.] Thompson told him and . . . not [Mr.] Thompson's own words." *Id.* at 109. The Alabama Court of Criminal Appeals acknowledged that Mr. Thompson's age was a relevant factor in the assessment of voluntariness, but found it did "not entitle[] [him] to have juvenile rights read to him." *Id.* at 110. Likewise, the Alabama Court of Criminal Appeals determined that Mr. Thompson's mental impairment was a relevant factor but not dispositive of his voluntariness. *Id.* at 110–11. The court found no evidence that Mr. Thompson was incapable of understanding his *Miranda* warnings. *Id.* at 112. Further, that court found that Mr. Thompson's three-hour interrogation was "not, in itself, coercive." *Id.* at 111. The Alabama Court of Criminal Appeals determined that the absence of a verbatim document did not render the statement inadmissible given

that the contents were substantially like Mr. Thompson's oral confession, and Agent Tubbs had witnessed Mr. Thompson sign the waiver-of-rights form as well as a corrected version of the confession. *Id.* Overall, the court held that "[b]ased on the totality of the circumstances, . . . the circuit court did not err in [admitting] [Mr.] Thompson's confession." *Id.* at 112.

Mr. Thompson cites four cases to overcome AEDPA deference: *Miranda v. Arizona*, 384 U.S. 436 (1966), *Haynes v. Washington*, 373 U.S. 503 (1963), *Rhode Island v. Innis*, 446 U.S. 291 (1980), and *Arizona v. Fulminante*, 499 U.S. 279 (1991). Doc. 33-1 at 106–110. These cases do not clearly establish that the Alabama Court of Criminal Appeals unreasonably applied Supreme Court precedent. The circumstances of Mr. Thompson's confession are different from the impermissible coercion in *Haynes*. Based on Agent Tubbs's testimony, the Alabama Court of Criminal Appeals determined that Mr. Thompson had signed a form waiving his *Miranda* rights before providing a confessional statement. *Thompson ACCA Direct*, 153 So. 3d at 111–12. But in *Haynes*, "[t]he petitioner at first resisted making a written statement and gave in only after consistent denials of his requests to call his wife, and the conditioning of such outside contact upon his accession to police demands." 373 U.S. at 514. And only after being "[c]onfronted with the express threat of continued incommunicado detention and induced by the promise of

communication with and access to family[, did the petitioner] understandably cho[o]se to make and sign the damning written statement." *Id.* And the outcome in *Innis* does not support Mr. Thompson. The *Innis* Court concluded that law enforcement had not violated the *Miranda* rights of the suspect during the interrogation. 446 U.S. at 301–02. And in sharp contrast to Mr. Thompson's facts, the state court in *Fulminante* found that "a credible threat of physical violence" existed in the absence of a confession. 499 U.S. at 288. Separately, Mr. Thompson has not cited any evidence that any factual determinations on which the Alabama Court of Criminal Appeals relied were objectively wrong. *See* Doc. 33-1 at 110.

Mr. Thompson also "assert[ed] that the statements he made while being transported from Belk, Alabama, to Pickens County were inadmissible" because he should have received a second *Miranda* warning. *Thompson ACCA Direct*, 153 So. 3d at 112. Based on Alabama Supreme Court precedent, the Alabama Court of Criminal Appeals concluded that the original *Miranda* warnings Mr. Thompson received "were not stale when [he] made the statements to [Chief Agent Danny] Jenkins approximately five hours" later. 153 So. 3d at 113, 149. The Alabama Court of Criminal Appeals determined also that "[t]he question [Chief Agent] Jenkins asked [Mr.] Thompson [in transport]—whether he was related to Mookie Moore—was not a question designed to elicit an incriminating response." *Id.* at 114.

Accordingly, the court concluded that a second *Miranda* warning was unnecessary. *Id.*

Mr. Thompson again relies on *Miranda*, *Haynes*, *Innis*, and *Fulminante* to overcome AEDPA deference to this ruling. None of those precedents addresses a constitutional claim about an allegedly stale *Miranda* warning. Therefore, Mr. Thompson cannot overcome AEDPA deference on these challenged statements.

**18. Medical Statement Claim**

Mr. Thompson asserts that his conviction is unconstitutional because incriminating statements he made to Dr. Willis during a mental evaluation on his competency to stand trial were inadmissible at trial. Doc. 15 at 67–70. Mr. Thompson raised this issue on direct appeal, Doc. 14-66 at 2, 51–57, and the Alabama Court of Criminal Appeals rejected it, *Thompson ACCA Direct*, 153 So. 3d at 145–47.

Mr. Thompson argued that the trial court violated his rights against self-incrimination and to counsel when it admitted the statements he made to Dr. Willis in the State's rebuttal case. *Id.* at 145. At trial, Mr. Thompson's counsel raised an objection that the trial court overruled. *Id.* The Alabama Court of Criminal Appeals implicitly determined that that ruling was error under Alabama Rule of Criminal Procedure 11.2(b)(2). *See id.* at 146–47. The court considered whether that error was

harmless under *Chapman v. California*, 386 U.S. 18 (1967), and other authorities. *Thompson ACCA Direct*, 153 So. 3d at 147. The Alabama Court of Criminal Appeals determined that Mr. Thompson's confession to Agent Tubbs "was significantly more incriminating than were the statements he made to Dr. Willis." *Id.* Based on that finding, the court concluded that admitting the statements which Mr. Thompson made to Dr. Willis "was harmless beyond a reasonable doubt." *Id.*

Warden Raybon is correct that two parts of this argument are procedurally defaulted: Mr. Thompson's argument that he did not have access to counsel when Dr. Willis evaluated him, and his allegation that the trial court relied on his incriminating statements to Dr. Willis in the sentencing phase. Doc. 26 at 58 n.9. Mr. Thompson did not argue either one of these points in the section of his direct appeal brief applicable to this claim. *See* Doc. 14-66 at 51–57.

As for the rest of the issue, Mr. Thompson cannot overcome AEDPA deference. "[W]hen a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under [Section] 2254 unless the harmlessness determination itself was unreasonable." *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis omitted). Mr. Thompson relies on *Estelle v. Smith*, 451 U.S. 454 (1981), *Powell v. Texas*, 492 U.S. 680 (1989), and *Fry* to overcome AEDPA deference, Doc. 33-1 at 114, but none of those authorities addresses a determination

that admitting into evidence at trial a statement made during a medical evaluation is harmless error. Accordingly, Mr. Thompson has not carried his burden to overcome AEDPA deference.

**19. Biased Juror Claims**

Mr. Thompson asserts that failing to remove biased members of the venire or jury—L.E., D.S., M.S., and S.W.—for cause was unconstitutional. Doc. 15 at 70–74. Mr. Thompson raised these issues on direct appeal, Doc. 14-66 at 2, 82–85, and the Alabama Court of Criminal Appeals rejected them. *Thompson ACCA Direct*, 153 So. 3d at 115–18.

Mr. Thompson did not seek to remove these individuals for cause during the selection process. *See id.* He argued that the trial court should have removed them *sua sponte* because "they stated during voir dire that they believed that [he] was guilty or their answers during voir dire showed an absolute bias against [him]." *Id.* at 115. Of the challenged group, only M.S. participated in jury deliberations—S.W. was struck, and L.E. and D.S. were alternates. *See id.* Accordingly, the Alabama Court of Criminal Appeals found that any failure to remove S.W., L.E., and D.S. "was harmless beyond a reasonable doubt." *Id.*

Mr. Thompson "assert[ed] that juror M.S. should have been struck for cause because, he said, she responded that she thought the insanity defense was used too

frequently." *Id.* at 117. But the Alabama Court of Criminal Appeals determined that her answers to follow-up questions showed that "she could follow the court's instructions," and "any feelings she had would not prevent her from giving [Mr.] Thompson a fair trial." *Id.* Consistent with that finding, the court concluded that "[t]he court did not err in failing sua sponte to remove M.S. for cause." *Id.*

Mr. Thompson relies on *Irvin v. Dowd*, 366 U.S. 717 (1961), to argue that the Alabama Court of Criminal Appeals unreasonably applied Supreme Court precedent. Doc. 33-1 at 122. But the language in *Irvin* that Mr. Thompson cites is dicta, not a holding, and did not clearly establish federal law for AEDPA purposes. *See Williams*, 529 U.S. at 412. Accordingly, *Irvin* does not clearly establish that the Alabama Court of Criminal Appeals unreasonably applied Supreme Court authority to reject these claims.

Although Mr. Thompson asserts an entitlement to relief under Section 2254(d)(2), the evidence he cites does not clearly and convincingly show that the Alabama Court of Criminal Appeals based its decision on unreasonable factual determinations. Doc. 33-1 at 122.

**20. Bad Acts Witness Claims**

Mr. Thompson asserts that his conviction is unconstitutional because the trial court allowed Gail Crump, one of Mr. Thompson's teachers at an alternative school

he attended, to testify as a rebuttal witness in the guilt phase. Doc. 15 at 78–80. Mr. Thompson asserts also that his sentence is unconstitutional because the trial court allowed Roger Satcher to testify in the penalty phase about Mr. Thompson's suspected drug use. *Id.* at 78–79. Mr. Thompson raised these issues on direct appeal, Doc. 14-66 at 2, 113–15, and the Alabama Court of Criminal Appeals rejected them, *Thompson ACCA Direct*, 153 So. 3d at 148–49 & n.18.

On direct appeal, Mr. Thompson did not cite any Supreme Court authority or other federal constitutional cases. *See* Doc. 14-66 at 113–15. The only reference to federal law appeared in boilerplate fashion in his brief:

> Admission of this evidence, the prosecutor's improper reliance on this evidence in argument to the jury, and the failure to give a limiting instruction violated [Mr.] [Thompson]'s rights to due process, a fair trial, the presumption of innocence, his right not to testify, and a reliable sentencing determination protected by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Alabama law.

*Id.* at 114–15. The Alabama Court of Criminal Appeals' denial of the claims does not address any constitutional issues. *See* 153 So. 3d at 148–49 & n.18.

Because Mr. Thompson did not cite any supporting caselaw, the court cannot find that he fairly presented these issues for the Alabama Court of Criminal Appeals to resolve. In any event, even if he did present the issues, AEDPA deference attaches

to the Alabama Court of Criminal Appeals' ruling. *See* Doc. 26 at 64–65. Mr. Thompson contends that the Alabama Court of Criminal Appeals unreasonably applied *Dowling v. United States*, 493 U.S. 342 (1990), and *Huddleston v. United States*, 485 U.S. 681 (1988). Doc. 33-1 at 123–24. But in *Dowling*, the Supreme Court concluded that the admission of "an alleged crime that the defendant had previously been acquitted of committing" did not violate the petitioner's double jeopardy or due process rights. 493 U.S. at 343–44. And *Huddleston* did not address a constitutional violation—it addresses the admission of bad acts evidence under Federal Rule of Evidence 404(b). 485 U.S. at 682. And Mr. Thompson cites no evidence to establish that the Alabama Court of Criminal Appeals made an unreasonable factual determination. *See* Doc. 33-1 at 124. Accordingly, he is due no habeas relief on these claims.

**21. Guilt-Phase Jury Instruction Claim**

Mr. Thompson asserts that his conviction is unconstitutional because of four errors in the guilt-phase jury instructions. Doc. 15 at 107–12. Mr. Thompson raised these issues on direct appeal, Doc. 14-66 at 2, 115–18, and the Alabama Court of Criminal Appeals rejected them, *Thompson ACCA Direct*, 153 So. 3d at 151–57.

As for Mr. Thompson's first reason, instructing the jury that it could find he had a guilty consciousness based on his flight after the murders, Mr. Thompson has

forfeited that issue on habeas review. *See* Doc. 15 at 107–09. He makes only conclusory statements that his constitutional rights were violated, *see id.* at 109, and he has not identified any relevant Supreme Court caselaw, *see id.*; Doc. 33-1 at 127–28 (arguing incompletely that "[t]his was an unreasonable application of clearly established"). This issue raises a question of state law, which is not a basis for federal habeas relief. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

The second error Mr. Thompson asserts involved the reasonable doubt instruction, in which the jury was instructed that "the jury's doubt 'must be an actual doubt, and not a mere guess or surprise; it is not a forced or captious doubt.'" *Thompson ACCA Direct*, 153 So. 3d at 153. During the charge conference, Mr. Thompson proposed other definitions of reasonable doubt. *Id.* "The circuit court refused . . . [those] charges and stated that it would give the pattern jury instruction on reasonable doubt." *Id.* According to Mr. Thompson, the "instruction on reasonable doubt was erroneous because . . . it lowered the State's burden of proof," in violation of the constitution. *Id.* Mr. Thompson cited *Cage v. Louisiana*, 498 U.S. 39 (1990), which recognized that using terms like "'grave uncertainty, actual

substantial doubt, and moral certainty' to define reasonable doubt could be interpreted 'to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.'" *Thompson ACCA Direct*, 153 So. 3d at 153 (quoting *Cage*, 498 U.S. at 41). The Alabama Court of Criminal Appeals concluded that "[t]he court's reasonable-doubt instruction did not violate . . . *Cage*." *Id.* at 154.

Mr. Thompson relies on *Cage* and *Middleton v. McNeil*, 541 U.S. 433 (2004), to overcome AEDPA deference on this issue. Doc. 33-1 at 128–29. But the pattern instruction that the trial court used in Mr. Thompson's case said "actual doubt," *id.* at 128, and made no mention of "actual substantial doubt," which was part of the issue in *Cage*, 498 U.S. at 41. Therefore, the Alabama Court of Criminal Appeals did not unreasonably apply *Cage* in determining that Mr. Thompson's case is different from *Cage*. In *Middleton*, the Supreme Court addressed a claim about a jury instruction in a habeas petition. 541 U.S. at 436. The challenged instruction did not involve reasonable doubt. *See id.* at 435. The *Middleton* Court held that, "[g]iven three correct instructions and one contrary one, the state court did not unreasonably apply federal law when it found that there was no reasonable likelihood the jury was misled." *Id.* at 438. There is no such issue in this case, which involves no instruction "contrary" to a correct instruction. Accordingly, neither of these cases carries Mr. Thompson's burden under Section 2254(d)(1).

Mr. Thompson says in passing that he satisfies Section 2254(d)(2) on this issue, *see* Doc. 33-1 at 128–29, but he cites no evidence to support an unreasonable factual determination.

The third error Mr. Thompson asserts is that the trial court should have instructed the jury that he "could not be convicted of capital murder if he did not have the intent to commit the underlying felony or if the underlying felony was committed as a 'mere afterthought.'" *Thompson ACCA Direct*, 153 So. 3d at 154. "The court charged the jury that the felony had to be committed during the course of the murder and that [Mr.] Thompson had to have both the specific intent to kill and the intent to commit the underlying felony." *Id.* Relying on Alabama Supreme Court authority, the Alabama Court of Criminal Appeals concluded that the trial court's "fail[ure] to use the term 'mere afterthought' in its instructions on the commission of the accompanying felony" was not plain error. 153 So. 3d at 155.

Mr. Thompson maintains that the Alabama Court of Criminal Appeals unreasonably applied *Beck v. Alabama*, 447 U.S. 625 (1980), because the trial court did not instruct on a "lesser included non-capital offense and when the evidence would have supported such a verdict." Doc. 33-1 at 129–30. The Alabama Court of Criminal Appeals addressed the requirement of *Beck* to incorporate a lesser included charge "when the evidence at trial warrant[s] [it]." 153 So. 3d at 155. The court noted

that Mr. Thompson had not requested a lesser included charge in his proposed instructions and no plain error existed if a trial court properly refused such a charge, if the evidence did not support it or the instruction would confuse the jury. *Id.* The Alabama Court of Criminal Appeals determined that "[t]here was no rational basis to support a conviction on any lesser-included offense." *Id.* at 156. Specifically, "there was no reasonable theory of the evidence that indicated that the murders were not intentional. . . . [or] that the taking of the gun and the killings were not committed pursuant to one course of conduct." *Id.* Accordingly, the Alabama Court of Criminal Appeals ruled that "the circuit court did not commit plain error in failing to sua sponte instruct the jury on murder, robbery, and felony murder." *Id.*

Mr. Thompson has not proven that the Alabama Court of Criminal Appeals unreasonably applied *Beck* in denying his claim based on a "mere afterthought" instruction or the failure to charge the jury on lesser-included offenses. And he has not identified evidence in the record to establish that the Alabama Court of Criminal Appeals relied on unreasonable factual findings in making these rulings.

The fourth error Mr. Thompson asserts is that "the circuit court erred in failing to give detailed instructions in regard to each count for each victim." *Thompson ACCA Direct*, 153 So. 3d at 156. Citing *In re Winship*, 397 U.S. 358, 364 (1970), Mr. Thompson argued on direct appeal that the failure to instruct the jury on each

element for each victim "lessened the State's burden of proof." Doc. 14-66 at 117. The Alabama Court of Criminal Appeals considered the instructions the trial court gave and authority on combining multiple counts in jury charges. 153 So. 3d at 156–57. The court concluded that "[t]he circuit court did not abuse its broad discretion in failing to repeat, for each separate count of the indictment, the same jury instructions." *Id.* at 157. The Alabama Court of Criminal Appeals did not discuss *Winship*.

Mr. Thompson contends that the Alabama Court of Criminal Appeals unreasonably applied *Winship* and *Woodson v. North Carolina*, 428 U.S. 280 (1976). Doc. 33-1 at 130. But neither *Winship* nor *Woodson* involves a claim based on unconstitutional jury instructions. *See Winship*, 397 U.S. at 359 (addressing a "single, narrow question whether proof beyond a reasonable doubt is among the 'essentials of due process and fair treatment' required during the adjudicatory stage when a juvenile is charged with an act which would constitute a crime if committed by an adult"); *Woodson*, 428 U.S. at 282 (addressing "whether the imposition of a death sentence for the crime of first-degree murder under the law of North Carolina violates the Eighth and Fourteenth Amendments"). Accordingly, neither *Winship* nor *Woodson* proves that the Alabama Court of Criminal Appeals unreasonably applied Supreme Court precedent. And Mr. Thompson identified no evidence that

the Alabama Court of Criminal Appeals made an unreasonable factual determination. *See* Doc. 33-1 at 130. Accordingly, Mr. Thompson is not due habeas relief based on any error in the jury instructions.

**22. *Crawford* Claim**

Mr. Thompson asserts that his conviction is unconstitutional because the autopsy reports should not have been admitted into evidence under *Crawford v. Washington*, 541 U.S. 36 (2004). Doc. 15 at 113–16. Mr. Thompson raised the *Crawford* claim on direct appeal, Doc. 14-66 at 2, 90–92, and the Alabama Court of Criminal Appeals rejected it, *Thompson ACCA Direct*, 153 So. 3d at 127–29.

At trial, the State moved to admit the autopsy reports of the three murder victims. *Id.* at 127. “John McDuffie, the director of the Tuscaloosa laboratory for the Alabama Department of Forensic Sciences,” testified that the doctor who performed the autopsies “had taken a medical retirement” and was “[in]capable of testifying.” *Id.* (cleaned up). The State sought to introduce the reports through Mr. McDuffie as the custodian of records. *See id.* Counsel for Mr. Thompson objected, arguing that their admission without . . . testimony [from the preparing doctor] violated the Confrontation Clause.” *Id.*

In *Crawford*, the Supreme Court held that admitting into evidence a wife’s out-of-court statements to police officers implicating her husband in a crime violated

the Confrontation Clause. 541 U.S. at 68–69. In Mr. Thompson's case, "the circuit court determined that the reports were nontestimonial and . . . admissible as business records." *Thompson ACCA Direct*, 153 So. 3d at 127. The Alabama Court of Criminal Appeals found no error, citing cases distinguishing between the testimonial statements of the wife in *Crawford* and nontestimonial records with "sufficient guarantees of reliability" to satisfy the Confrontation Clause. *Id.* at 128–29 (quoting *Perkins v. State*, 897 So. 2d 457 (Ala. Crim. App. 2004); *White v. Illinois*, 502 U.S. 346, 356 (1992)) (cleaned up).

Mr. Thompson contends that the Alabama Court of Criminal Appeals unreasonably applied *Crawford* and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). Doc. 33-1 at 133. But neither of those precedents held that autopsy reports are testimonial documents, or that admitting such reports through a records custodian violates the Confrontation Clause. *See Crawford*, 541 U.S. at 68–69; *Melendez-Diaz*, 557 U.S. at 311. Accordingly, Mr. Thompson has not carried his burden under Section 2254(d)(1). And Mr. Thompson has not identified any evidence to carry his burden under Section 2254(d)(2). *See* Doc. 33-1 at 133.

**23. *Ring* and *Hurst* Claims**

Mr. Thompson asserts that his death sentence is unconstitutional under *Ring v. Arizona*, 536 U.S. 584 (2002), and *Hurst v. Florida*, 577 U.S. 92 (2016). Doc. 15

at 116–19. Mr. Thompson raised the *Ring* claim on direct appeal, Doc. 14-66 at 2, 124–27, and the Alabama Court of Criminal Appeals rejected it, *Thompson ACCA Direct*, 153 So. 3d at 179–80.

Mr. Thompson argued that *Ring* required unanimous jury findings that "the statutory aggravating circumstances exist beyond a reasonable doubt and . . . the aggravating circumstance(s) outweighs the mitigating circumstances." *Id.* at 179 (cleaned up). In rejecting these arguments, the Alabama Court of Criminal Appeals cited several authorities holding that "*Ring* requires only that the jury unanimously find the existence of an aggravating circumstance in order to make the defendant death-eligible," and *Ring* "do[es] not require that the jury make every factual determination." *Id.* (cleaned up).

Warden Raybon defends the *Ring* claim based on AEDPA deference and does not discuss the *Hurst* claim. Doc. 26 at 85–87. Mr. Thompson maintains that the Alabama Court of Criminal Appeals unreasonably applied *Ring* and its predecessor, *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Doc. 33-1 at 139. He reasserts a *Hurst* claim. *Id.* at 136.

Because *Apprendi* did not involve a death sentence, 530 U.S. at 469, it cannot help him prove that the Alabama Court of Criminal Appeals unreasonably applied Supreme Court precedent.

As for *Ring*, which did involve a death sentence, it also cannot help Mr. Thompson carry his burden under Section 2254(d)(1). In *Ring*, the Supreme Court held that Arizona's capital sentencing framework—which lacked any jury finding on aggravation beyond a reasonable doubt—violated the petitioner's right to a jury trial under the Sixth Amendment. *See* 536 U.S. at 588, 595. But Alabama's capital sentencing framework is materially different. Here, a unanimous jury determination of an aggravating factor beyond a reasonable doubt in the guilt phase was a prerequisite to Mr. Thompson's death sentence. *See Thompson ACCA Direct*, 153 So. 3d at 166–67. Accordingly, *Ring* does not clearly establish that the Alabama Court of Criminal Appeals unreasonably applied clearly established law in its assessment of Mr. Thompson's sentence.

Mr. Thompson's *Hurst* argument meets the same fate. In *Hurst*, the Supreme Court invalidated Florida's capital sentencing framework on Sixth Amendment grounds. 577 U.S. at 102–03. When Mr. Thompson received his death sentence, Alabama's capital sentencing framework was similar, but not identical, to the framework invalidated in *Hurst*. But the Supreme Court decided *Hurst* years after the conclusion of Mr. Thompson's direct review proceedings, and Mr. Thompson did not assert a *Hurst* challenge until his postconviction appeal in state court. *See Thompson Collateral*, 310 So. 3d at 885. Both the Supreme Court and the Eleventh

Circuit have directly held that "*Hurst* do[es] not apply retroactively on collateral review." *McKinney v. Arizona*, 589 U.S. 139, 145 (2020) (citing *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004)); *see also Lambrix v. Sec'y, Fla. Dep't of Corr.*, 851 F.3d 1158, 1165 n.2 (11th Cir. 2017) ("*Hurst* . . . is not retroactively applicable on collateral review."). Accordingly, Mr. Thompson is due no habeas relief based on *Apprendi*, *Ring*, or *Hurst*.

**24. Extrinsic Evidence Claim**

Mr. Thompson asserts that the jury's consideration of extrinsic evidence during the guilt phase of his trial violated his due process rights. Doc. 15 at 122–25. Mr. Thompson raised this issue on direct appeal, Doc. 14-66 at 2, 79–81, and the Alabama Court of Criminal Appeals rejected it, *Thompson ACCA Direct*, 153 So. 3d at 130–32.

During a polling process related to the removal of a juror, two other jurors reported "that other people had approached them and said that they were praying for them." *Id.* at 131. According to those jurors, those non-jurors "did not attempt to talk about the case or to influence them in any way." *Id.* "Defense counsel requested a mistrial or," alternatively, the jurors' removal because the jurors might "interpret those comments about praying for them to be [saying] that they were praying that they would impose the death penalty and achieve retribution in this case." *Id.*

(cleaned up). In denying the motion, the trial court explained that the "jurors . . . were remarkable in their responses about doing their duty and their responsibilities as jurors, just as the Court has instructed them." *Id.* The court added that in-chambers discussions reassured the court that these jurors would "make a decision based solely on the facts and law in this case." *Id.* The Alabama Court of Criminal Appeals determined that the record did not support a finding of presumed prejudice, so Mr. Thompson had the burden to prove actual prejudice. *Id.* at 132. And the court found insufficient evidence of actual prejudice. *Id.*

Mr. Thompson argues that the Alabama Court of Criminal Appeals unreasonably applied *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Remmer v. United States*, 347 U.S. 227 (1954). Doc. 33-1 at 140–42. But those cases are fundamentally unlike Mr. Thompson's case. In *Turner*, two deputy sheriffs testified for the prosecution and assisted, "freely mingled[,] and conversed with the [sequestered] jurors in and out of the courthouse during the [three-day] trial." 379 U.S. at 466, 469. Although counsel moved for a mistrial twice, the trial court "denied the motions . . . upon the ground that there was no showing that either deputy had talked with any member of the jury about the case." *Id.* at 468–69. The Supreme Court reversed because of "the extreme prejudice inherent in [a] continual association throughout the trial between the jurors and . . . two key witnesses for the

prosecution" and observed that the interaction between the deputy sheriffs and the jurors was more than "a brief encounter." *Id.* at 473. Mr. Thompson's case involves no such facts.

In *Remmer*, a juror, who later became the foreman, had an unnamed person tell him that "he could profit by bringing in a verdict favorable to the petitioner." 347 U.S. at 228. "The juror reported the incident to the judge, who informed the prosecuting attorneys and advised with them" without including the petitioner's trial counsel. *Id.* After an F.B.I. agent investigated the incident and submitted a report to the court, the judge and prosecutors "apparently concluded that the statement to the juror was made in jest." *Id.* The petitioner and counsel learned about the F.B.I investigation "in the newspapers after the [guilty] verdict." *Id.* Counsel moved for a new trial, and the district court denied the motion without holding the requested hearing. *Id.* at 229. "The Court of Appeals held that the [d]istrict [c]ourt had not abused its discretion, since the petitioner had shown no prejudice to him." *Id.* In vacating that judgment, the Supreme Court relied on a "presumptively prejudicial" standard that applies to "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury," if not made at the court's direction and "with full knowledge of the parties." *Id.* The *Remmer* Court noted that "[a] juror must feel free to exercise his functions without

the F.B.I. or anyone else looking over his shoulder." *Id.* The Court remanded the case "with directions to hold a hearing to determine whether the incident complained of was harmful to the petitioner." *Id.* at 230. In Mr. Thompson's case, the jurors' interaction with people from church and their community does not approach the presumptively prejudicial mid-trial and *ex parte* F.B.I. investigation involving an overt attempt to bribe a juror.

To carry his burden under Section 2254(d)(2), Mr. Thompson attacks as unreasonable the factual determination that presumed prejudice did not exist. Doc. 33-1 at 141–42. He argues that the context of other people telling the jurors "that they hoped that they would 'do the right thing'" had an unequivocal meaning: "convicting Mr. Thompson and sentencing him to death." *Id.* at 141. The factual record does not support this argument. Both jurors stated that the people who spoke to them did not try to influence them about the case. Doc. 14-16 at 143–44, 149. And reference to the "right thing" came in a response from one of the jurors to counsel who asked her to interpret what the people who said they were praying for her meant by that statement. *Id.* at 149. When counsel asked if she had an "idea what they think the right thing might be?", she answered, "I don't know their views on it." *Id.* at 149–50. Accordingly, the correctness of the presumed prejudice determination is not beyond reasonable debate.

**25. Rebuttal Witness Claim**

Mr. Thompson asserts that his conviction is unconstitutional because Morris Moore, a principal at Hubbertsville High School, should not have been allowed to testify as a rebuttal witness. Doc. 15 at 83–85. Mr. Thompson raised this issue on direct appeal, Doc. 14-66 at 2, 35–38, and the Alabama Court of Criminal Appeals rejected it, *Thompson ACCA Direct*, 153 So. 3d at 142–44.

Mr. Thompson argued that Principal Moore's close relationship with one of the jurors, who was a teacher at the same school, violated *Turner*. *Thompson ACCA Direct*, 153 So. 3d at 142. The juror had expressed to Principal Moore that "she wished the case would be over soon because she did not want the school term to start with a substitute teacher." *Id.* Principal Moore responded to her that "he might be called as a witness." *Id.* According to Principal Moore, "the juror did not ask any questions concerning his possible testimony," and "he did not volunteer any information." *Id.*

The Alabama Court of Criminal Appeals reviewed this issue for plain error because Mr. Thompson's argument on appeal was not the objection he made at trial. *Id.* 142–43. The court determined that Mr. Thompson's case was unlike *Turner* because "the contact between [Principal] Moore and the juror was not 'close and continual' nor was [Principal] Moore a key State witness." *Id.* at 144. Accordingly,

the Alabama Court of Criminal Appeals found that Mr. Thompson "was required to establish prejudice" and had not satisfied that burden. *Id.*

Mr. Thompson argues that the Alabama Court of Criminal Appeals unreasonably applied *Turner* and *Irvin*. Doc. 33-1 at 125. But Mr. Thompson's case is unlike those cases. *Irvin* is contextually unhelpful to Mr. Thompson. *Irvin* addressed a claim that the petitioner did not receive a fair trial because of pretrial publicity. 366 U.S. at 720, 725. And as previously explained, in *Turner*, the sheriff's deputies who testified in the State's case also assisted, conversed, and mingled with sequestered jurors over the duration of the three-day trial. 379 U.S. at 466, 469. Those interactions are different in kind from the brief encounter Principal Moore had with the member of Mr. Thompson's jury. Accordingly, whether the Alabama Court of Criminal Appeals misapplied *Turner* is subject to reasonable disagreement.

And Mr. Thompson has not identified record evidence that contradicts (1) the finding that Principal Moore and the juror did not have a "close and continual" association, or (2) that the Court of Criminal Appeals objectively erred in finding that Principal Moore was not a "key" witness under *Turner*. *See* Doc. 33-1 at 126–27. Accordingly, Mr. Thompson has not carried his burden under Section 2254(d)(1) or (d)(2).

**26. Penalty-Phase Prosecutorial Misconduct Claim**

Mr. Thompson asserts that prosecutorial misconduct in closing arguments at the penalty phase rendered his death sentence unconstitutional. Doc. 15 at 125–34. Mr. Thompson raised these issues on direct appeal, Doc. 14-66 at 2, 62, 68–78, and the Alabama Court of Criminal Appeals rejected them, *Thompson ACCA Direct*, 153 So. 3d at 171–76.

The Alabama Court of Criminal Appeals found no impropriety in five of the nine prosecutorial statements Mr. Thompson challenged. *Id.* at 172–75. These contentions included that the prosecutor had improperly "denigrated the role of mitigation," relied on "speculation" to argue that death was the appropriate sentence, referred to mannequins (representing the victims) even though they were demonstrative aids only, commented on Mr. Thompson's "lack of remorse," and "urg[ed] the jury to rely on the Bible instead of the law when determining the correct punishment." *Id.* Mr. Thompson's Bible-based challenge had a unique provenance: defense counsel "read out of the King James Bible" in his closing, and "[t]he prosecutor's arguments were a reply-in-kind to [defense counsel's] closing argument." *Id.* at 174–75 (cleaned up).

The Alabama Court of Criminal Appeals reviewed four other challenged statements for plain error.

Mr. Thompson maintained that in the first such statement, the prosecutor "improperly compared [Mr. Thompson's] rights with those of the victims." *Id.* at 171. The prosecutor's statement was as follows:

> But [Thompson's psychologist] told you that all these things from all these records—which include all this hearsay, which is admissible at this stage—all of these things would make you sympathize with the defendant to the extent that you would recommend to the Judge that he impose a life sentence. And what did he tell her to tell you? He told her to tell you that he doesn't want to die because he still wants to see his family. He still thinks that he has some right that he didn't afford the victims of his crimes.

*Id.* (quoting Doc. 14-24 at 46). The Alabama Court of Criminal Appeals observed that although "a prosecutor should not compare the rights of a victim with those of the defendant, . . . such arguments rarely rise to the level of plain error." *Id.* Relying on precedent involving "numerous" such "improper" comparisons, the court concluded that no plain error occurred. *Id.* (emphasis omitted) (quoting *McNair v. State*, 653 So. 2d at 320, 337 (Ala. Crim. App. 1992)). Instead, the prosecutor's "references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict." *Id.* at 171–72 (quoting *McNair*, 653 So. 2d at 337–38).

Mr. Thompson contended that in the second statement reviewed for plain error, "the prosecutor improperly expressed his opinion concerning the appropriateness of the death sentence." *Id.* at 172. The prosecutor stated as follows:

> I've only had to do this one time before. And it is a difficult thing to develop the resolve—where you have beliefs such as those many of you have expressed, religious beliefs, beliefs about your faith, belief in God, to develop the resolve to make a recommendation that someone be sentenced to death. And it is with very solemn seriousness that the State makes this recommendation that you make this recommendation at this time. . . .
>
> One of the jurors, earlier in their comments about the death penalty, indicated the seriousness with which they face this duty and that they would face their oath, stating, very appropriately, "if the evidence is there, I could recommend it, but it would really have to be there." I submit to you that if it's not there in this case, it's never there.

*Id.* (quoting Doc. 14-23 at 193–94). Reviewing these remarks in the context of the record and relying on persuasive precedents, the Alabama Court of Criminal Appeals found no plain error existed and concluded that the comments "did not undermine the fundamental fairness of the proceedings." *Id.*

Mr. Thompson argued that in the third statement reviewed for plain error, the prosecutor improperly referenced the victims' family members to obtain a jury recommendation of death based on sympathy. *Id.* at 171. In one example, the prosecutor argued:

> Justice sets a standard that we must all try to measure up to if we're going to live in a free society. Whether it be in our daily lives, our churches, in judging cases, we all have to measure up to the mark of justice. If there is one reason to recommend the death penalty in this case, I suggest to you that it was sitting out here in this courtroom yesterday, out here in these pews, Julian Crump wanted to be a policeman before his daddy died.

*Id.* (quoting Doc. 14-24 at 70). The Alabama Court of Criminal Appeals "d[id] not condone the above comments" but was "confident that the argument did not so 'infect[] the [proceedings] with unfairness' that [Mr.] Thompson was denied due process." *Id.* (quoting *Darden*, 477 U.S. at 181).

Mr. Thompson maintained that in the fourth statement reviewed for plain error, "the prosecutor improperly argued . . . that the appellate court would review the jury's verdict." *Id.* at 175–76. The prosecutor's statement was as follows:

> If [Mr. Thompson] gets the death penalty, as we argue to you that he should, he'll die one day at an appointed hour with fair warning, plenty of time to talk to his family, plenty of time to plead his case to the highest courts.

*Id.* at 176 (quoting Doc. 14-24 at 66). "[C]ounsel objected to this argument and moved for a mistrial." *Id.*. "The court sustained the objection and instructed the jury to disregard the comment." *Id.* (citing Doc. 14-24 at 67). The Alabama Court of Criminal Appeals determined that the trial court had "cured any possible error that may have occurred" in instructing "the jury to disregard the comment." *Id.*

Mr. Thompson also asserted that "the cumulative effect of the prosecutorial misconduct denied him . . . a reliable sentencing hearing." *Id.* The Alabama Court of Criminal Appeals held that collectively "the alleged instances of prosecutorial misconduct did not adversely affect [his] substantial rights and d[id] not require reversal." *Id.*

Warden Raybon asserts that Mr. Thompson's argument about the statement involving the curative instruction is procedurally defaulted because the Alabama Court of Criminal Appeals "noted that there was no adverse ruling to appeal." Doc. 26 at 104–05. Mr. Thompson does not address this assertion about procedural default. *See* Doc. 33-1 at 146–47.

Separately, Warden Raybon relies on AEDPA deference, Doc. 26 at 106–07, and Mr. Thompson asserts that the Alabama Court of Criminal Appeals unreasonably applied *Young*, *Doyle v. Ohio*, 426 U.S. 610 (1976), *Berger v. United States*, 295 U.S. 78 (1935), and *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Doc. 33-1 at 148. Mr. Thompson maintains also that the Alabama Court of Criminal Appeals based its decision on an unreasonable determination of facts. *Id.* at 147–48.

Because most of the Supreme Court cases Mr. Thompson cites are not capital cases, they do not involve claims of penalty-phase prosecutorial misconduct. *See Young*, 470 U.S. at 4; *Doyle*, 426 U.S. at 611; *Berger*, 295 U.S. at 79–80.

In *Caldwell*, "a prosecutor urged the jury not to view itself as determining whether the defendant would die, because a death sentence would be reviewed for correctness by the State Supreme Court." 472 U.S. at 323. The habeas petitioner "conten[ded] that the prosecutor's argument rendered the capital sentencing proceeding inconsistent with the Eighth Amendment's heightened need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* (cleaned up). The Supreme Court agreed and vacated the petitioner's capital sentence. *Id.*

Critically, when the *Caldwell* trial court addressed the objection to the prosecutor's comments that the jury's decision was "not . . . final" and its "job . . . reviewable," the trial court did not instruct the jury to disregard the remarks. *Id.* at 325 (cleaned up). Instead, that trial court permitted the prosecutor to "make the full expression" and tell the jury that its decision was "automatically reviewable." *Id.* (cleaned up). This makes *Caldwell* fundamentally unlike Mr. Thompson's case where the trial court instructed the jury to disregard the remarks. Additionally, as a pre-AEDPA decision, *Caldwell* does not clearly establish constitutional error by the Alabama Court of Criminal Appeals. *Cf. Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1269 (11th Cir. 2022) (observing that non-AEDPA cases "offer no guidance" when Section 2254(d) applies to the prejudice prong of an ineffective

mitigation assistance claim) (quoting *Pinholster*, 563 U.S. at 202). Accordingly, *Caldwell* does not clearly establish that the Alabama Court of Criminal Appeals unreasonably applied Supreme Court precedent to Mr. Thompson's argument.

Mr. Thompson argues also that the Alabama Court of Criminal Appeals unreasonably ruled that the prosecutor's comments about the demonstrative mannequins were proper. Doc. 33-1 at 144. Mr. Thompson cites *Donnelly v. DeChristoforo*, 416 U.S. 637, 638 (1974), in which a jury convicted a defendant of first-degree murder, and he received a life sentence consistent with the jury's recommendation. The *Donnelly* Court considered a claim of guilt-phase prosecutorial misconduct without an issue based on demonstrative exhibits, and the habeas relief was denied. *Id.* at 640, 643. Accordingly, Mr. Thompson cannot rely on *Donnelly* to carry his burden under Section 2254(d)(1).

As for Section 2254(d)(2), Mr. Thompson contends that "[t]he prosecutor first brought up the Bible during the penalty phase, and then wrongfully relied on Mr. Thompson's counsel bringing it up later to use it again during the penalty phase." Doc. 33-1 at 145. But Mr. Thompson does not identify any part of the record to support his assertion that the prosecutor mentioned the Bible first, nor does he explain how the context of that first reference to the Bible overlaps with the

prosecutorial statement he is challenging as improper. *See id.* Accordingly, Mr. Thompson cannot carry his burden under Section 2254(d)(2).

**27. Advisory Verdict Claims**

Mr. Thompson asserts that his sentence is unconstitutional because of improper references by the trial court and prosecutor to the jury's advisory role at sentencing. Doc. 15 at 102–106. Mr. Thompson raised an advisory verdict issue on direct appeal, Doc. 14-66 at 2, 123–24, and the Alabama Court of Criminal Appeals rejected it, *Thompson ACCA Direct*, 153 So. 3d at 164.

On direct review, Mr. Thompson relied on *Caldwell* and *Darden*. Doc. 14-66 at 124. The Alabama Court of Criminal Appeals discussed *Caldwell* and drew a distinction between an improper reference to appellate review of a death sentence and an acknowledgment that under Alabama's capital structure, "the trial judge—not the jury—[wa]s the sentencer." 153 So. 3d at 164 (cleaned up).

Mr. Thompson also raised this issue on collateral appeal. On collateral appeal, he relied on *Ring* and *Hurst*. Doc. 14-76 at 2, 108–12; *Thompson Collateral*, 310 So. 3d at 885. The Alabama Court of Criminal Appeals rejected the *Ring*-based claim because "on direct appeal [it had] held that [Mr.] Thompson's sentence of death did not violate *Ring*." 310 So. 3d at 885. The court rejected the *Hurst*-based claim

because "the Alabama Supreme Court reaffirmed [post-*Hurst*] its holding that Alabama's capital sentencing scheme d[id] not violate *Ring* and its progeny." *Id.*

Warden Raybon relies on AEDPA deference to defend the direct appeal ruling and procedural default to defend the collateral appeal ruling. Doc. 26 at 74–76. Mr. Thompson contends that the Alabama Court of Criminal Appeals unreasonably applied *Caldwell*, *Darden*, *Ring*, and *Hurst*. Doc. 33-1 at 133–36. He disagrees with Warden Raybon's procedural default defense, arguing that the collateral appeal decision did not reference a state procedural rule and was merits-based. *Id.* at 135 n.69.

Even if Mr. Thompson is correct that the Alabama Court of Criminal Appeals rejected his collateral attack on the merits (an issue this court does not decide), Mr. Thompson is due no habeas relief. The cases he cites do not clearly establish that the Alabama Court of Criminal Appeals unreasonably rejected his advisory verdict arguments. The only remotely analogous decision is *Caldwell*, and it lacks any analysis of trial court or prosecutorial references to a jury's advisory role. Accordingly in a sentencing framework like Alabama's, whether the Alabama Court of Criminal Appeals erroneously rejected Mr. Thompson's arguments is not beyond reasonable discussion. And *Hurst* supplies no basis for habeas relief because, as previously explained, *Hurst* does not apply retroactively. *See supra* Part III.B.23.

**28. *Roper* Claim**

Mr. Thompson asserts that his death sentence is unconstitutional under *Roper v. Simmons*, 543 U.S. 551 (2005). Doc. 15 at 137–39. The *Roper* Court held that the execution of a person who was under the age of eighteen when their capital offense occurred is cruel and unusual punishment under the Eighth Amendment. 543 U.S. at 578. Mr. Thompson raised this issue on direct appeal, Doc. 14-66 at 2, 98–104, and the Alabama Court of Criminal Appeals rejected it, *Thompson ACCA Direct*, 153 So. 3d at 176–78.

The Alabama Court of Criminal Appeals held that Mr. Thompson's "death sentence is consistent with *Roper*" because he "was 18 years of age at the time of the murders." *Id.* at 177. Additionally, that court understood *Roper* to "establish[] a bright-line rule based on the chronological age of the defendant" and declined to "depart from *Roper* to consider [Mr.] Thompson's 'mental age.'" *Id.* at 178.

Mr. Thompson maintains that the Alabama Court of Criminal Appeals unreasonably applied *Roper* and unreasonably failed to consider his mental age, as well as his actual age. Doc. 33-1 at 138–39.

Mr. Thompson has not carried his burden under Section 2254(d)(1) or (d)(2). *Roper* announced a bright-line rule based on a defendant's physical age in years and made no provision that a court should consider any other age metric. *See Roper*, 543

U.S. at 578. Accordingly, it was not unreasonable for the Alabama Court of Criminal Appeals to decline to extend *Roper* to Mr. Thompson's theory about his mental age. As for his burden under Section 2254(d)(2), Mr. Thompson cites no evidence that he was under eighteen years old at the time of the murders.

**29. Weight Assignment Claim**

Mr. Thompson asserts that the trial court's failure to assign proper weight to several mitigating factors renders his death sentence unconstitutional. Doc. 15 at 143–44. The mitigating factors Mr. Thompson identifies are his young age, history of abuse, extreme mental or emotional disturbance, and PTSD. *Id.* Mr. Thompson asserts also that the sentencing court should not have relied on statements he made to Dr. Willis and Agent Tubbs and "did not meet the standard of [a] rational factfinder [under] *Jackson v. Virginia*, 443 U.S. 307, 319, 324 (1979)." *Id.* Mr. Thompson raised some of these issues on direct appeal. Doc. 14-66 at 2, 92–96. The Alabama Court of Criminal Appeals assessed "the propriety of [Mr.] Thompson's capital-murder conviction and sentence of death" under Alabama Code § 13A–5–53 and concluded "that the death penalty was the appropriate sentence in this case." *Thompson ACCA Direct*, 153 So. 3d at 183, 189–90. That statute requires that court to independently weigh the aggravating and mitigating circumstances. Ala. Code § 13A–5–53(b)(2).

The Alabama Court of Criminal Appeals recognized that "*Lockett* [*v. Ohio*, 438 U.S, 586 (1978),] and its progeny require consideration of all evidence submitted as mitigation." *Thompson ACCA Direct*, 153 So. 3d at 189 (cleaned up). And it recognized that, assigning weight "to the mitigating evidence is strictly within the discretion of the sentencing authority." *Id.* (cleaned up).

Mr. Thompson maintains that the Alabama Court of Criminal Appeals unreasonably applied *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and unreasonably determined facts based on the evidence of his PTSD and young age. Doc. 33-1 at 151–53.

On direct appeal, Mr. Thompson did not assert that it was improper for the circuit court to consider the statements he made to Dr. Willis and Agent Tubbs in assessing the weight of the mitigating factors. *See* Doc. 14-66 at 92–98. He also did not challenge the court's assignment of "weak" weight to his young age. *See id.* Thus, those allegations are procedurally defaulted.

Mr. Thompson has not established that the Alabama Court of Criminal Appeals unreasonably applied *Lockett*. *Lockett* does not address how to weigh a mitigating factor; it simply clarifies that the Eighth and Fourteenth Amendments require an "individualized consideration of mitigating factors" in death penalty cases. 438 U.S. at 606. Under *Lockett*, a sentencer must consider "any aspect of a

defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604. The Alabama courts carefully considered Mr. Thompson's history of abuse, extreme mental or emotional disturbance, and PTSD in their decisions; accordingly, they did not unreasonably apply *Lockett*. Similarly, neither *Eddings* nor *Jackson* clearly establish a specific method a state court must use to assign weight to various mitigating factors. *See Eddings*, 455 U.S. at 114 (holding that "the sentencer [may not] refuse to consider, *as a matter of law*, any relevant mitigating evidence"); *Jackson*, 443 U.S. at 324 (establishing a sufficiency of evidence standard in challenging a conviction on habeas review). Accordingly, Mr. Thompson has not satisfied his burden under Section 2254(d)(1). And because Mr. Thompson has not cited any evidence that the Alabama courts excluded from their consideration of Mr. Thompson's mitigation case, he has not satisfied his burden under Section 2254(d)(2).

**30. Non-Statutory Mitigating Factor Claim**

Mr. Thompson asserts that his death sentence is unconstitutional because the trial court failed to credit that his family loved him as a mitigating factor. Doc. 15 at 144–46. Mr. Thompson raised this issue on direct appeal, Doc. 14-66 at 2, 96–97,

and the Court of Criminal Appeals rejected it, *Thompson ACCA Direct*, 153 So. 3d at 189–90.

According to the Alabama Court of Criminal Appeals, the trial court found that the evidence of Mr. Thompson's "abusive and violent upbringing" introduced in "the guilt and sentencing stages" made it "clear that this mitigating circumstance . . . . d[id] not exist." *Id.* at 189. The court recognized that *Lockett* left the sentencer with the discretion to decide whether offered evidence "is actually" mitigating. *Id.* (cleaned up).

According to Mr. Thompson, the Alabama courts "unreasonably found facts and applied *Lockett*" in rejecting the existence of this allegedly mitigating circumstance. Doc. 33-1 at 155. But as discussed above, *Lockett* does not hold that the constitution requires a sentencer to weigh a specific mitigating circumstance in a specific way—it simply requires an individualized consideration of any evidence the defendant offers. *See supra* Part III.B.30. The Alabama courts did this, so they did not apply *Lockett* unreasonably. And Mr. Thompson has not cited evidence that the Alabama courts improperly refused to consider this factor. Accordingly, he is due no habeas relief.

**31. Double Jeopardy Claim**

Mr. Thompson asserts that his six capital convictions based on three murders violated his double jeopardy rights. Doc. 15 at 146–48. Mr. Thompson maintains that "the offense of murder and murder during a robbery, where the alleged robbery was the murder weapon, is the same offense, with the same facts." *Id.* at 147. Mr. Thompson raised on direct appeal a double jeopardy issue based on a "multiplicity of counts" "predicated on the same act" and "not temporally distinguished." Doc. 14-66 at 2, 131. The Alabama Court of Criminal Appeals rejected that argument. *Thompson ACCA Direct*, 153 So. 3d at 161–62.

The Alabama Court of Criminal Appeals analyzed several Alabama precedents, including one that cited *Blockburger v. United States*, 284 U.S. 299 (1932). *See Thompson ACCA Direct*, 153 So. 3d at 162. *Blockburger* upheld a federal prisoner's convictions and sentence because the statutory "offenses created require[d] proof of a different element." 284 U.S. at 304. The Alabama Court of Criminal Appeals concluded that Mr. Thompson's convictions did not violate his double jeopardy rights because each count "required proof of an element not found in the other counts." *Thompson ACCA Direct*, 153 So. 3d at 162.

Warden Raybon points argues that the version of this claim Mr. Thompson exhausted in state court is not the same as the one he presents now. Doc. 26 at 118–

19. Alternatively, Warden Raybon argues that AEDPA deference precludes relief. *Id.* at 119–21. Mr. Thompson replies that "the removal or addition of a few sentences does not change the argument made: that charging [him] on six counts of murder for the deaths of three individuals was a violation of double jeopardy." Doc. 33-1 at 155 n.77.

Mr. Thompson's habeas double jeopardy claim is fundamentally different from the one he exhausted in state court. On direct appeal, Mr. Thompson argued that the capital murder counts: (1) "were not temporally distinguished in any way and each was predicated on the same act" and (2) were "nothing more than an attempt to prejudice the jurors against [him] and lead them to believe that he was guilty of numerous crimes." Doc. 14-66 at 131. On habeas review, he asserts that: (1) "murder and murder during a robbery, where the alleged robbery was the murder weapon, is the same offense, with the same facts," and (2) the trial court's jury instructions on murder were unconstitutional. Doc. 15 at 147–48. Mr. Thompson's double jeopardy claims in state and federal court vary more than simply removing or adding a few sentences. Accordingly, procedural default bars this claim.

And even if Mr. Thompson's claim is not procedurally defaulted, he has not established that the Alabama Court of Criminal Appeals unreasonably rejected it under *Blockburger*. *See* Doc. 33-1 at 155–56. *Blockburger* did not hold that charging

a defendant with two capital murder counts for each victim when the stolen item was the weapon used to commit the murders is a double jeopardy violation. *See* 284 U.S. at 303–04. Accordingly, Mr. Thompson has not carried his burden under Section 2254(d)(1).

## IV. REQUEST FOR AN EVIDENTIARY HEARING AND DISCOVERY

Mr. Thompson has not alleged facts that would entitle him to habeas relief, so the court will not hold an evidentiary hearing or allow discovery. *See Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 763 (11th Cir. 2010) ("Having alleged no specific facts that, if true, would entitle him to federal habeas relief, [the petitioner] is not entitled to an evidentiary hearing.").

## V. CONCLUSION

For the reasons stated above, Mr. Thompson's claims and request for an evidentiary hearing and discovery are due to be denied, and his Section 2254 petition is due to be dismissed. This court will enter a Final Judgment dismissing Mr. Thompson's Amended Petition for a Writ of Habeas Corpus, Doc. 15, contemporaneously with this Memorandum Opinion.

Under Rule 11(a) of the Rules Governing Section 2254 Cases in the United States Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the habeas petitioner. This court may issue a certificate

of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further," *Cockrell*, 537 U.S. at 336 (cleaned up). For claims rejected without reaching the merits, a petitioner must demonstrate that reasonable jurists would debate "whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

The court finds that Mr. Thompson's claims do not satisfy these standards for granting a certificate of appealability. Accordingly, this court will deny Mr. Thompson a certificate of appealability in the Final Judgment entered contemporaneously herewith.

**DONE** and **ORDERED** this 5th day of November, 2026.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE